THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CYNTHIA PUGH, Appellant.

Fourth Department, April 5, 1985

## APPEARANCES OF COUNSEL

*Paul R. Shanahan* and *Emil M. Rossi* (*Paul Shanahan* of counsel), for appellant.

*Richard Hennessy, Jr., District Attorney* (*John Cirando, William J. Fitzpatrick* and *Beth J. Van Doren* of counsel), for respondent.

## OPINION OF THE COURT

DENMAN, J.

Cynthia Pugh was convicted of murder in the second degree for the February 24, 1983 shooting death of James Pipines, her employer and lover, while he lay in bed in his home in Fayetteville. After her first trial ended in a hung jury, a second trial was held at which 62 witnesses testified and 96 exhibits were received. Additionally, there were extensive hearings on defendant's posttrial motions to set aside the verdict. Defendant now seeks reversal of the judgment of conviction and dismissal of the indictment or, in the alternative, a new trial. She claims that the evidence of her guilt was legally insufficient; that the court erred in denying her motion to set aside the verdict for the People's failure to provide her with *Brady* material; that the court erred in denying her motion to set aside the verdict on the ground that a juror had given false answers which concealed a preexisting bias; that prosecutorial misconduct compels reversal; and that the court erred in prohibiting defendant from introducing certain proof. We have reviewed each of the several grounds of error urged and find that none requires reversal.

### DEFENDANT'S ACCOUNT OF THE DAY OF THE MURDER

Defendant claimed that on the night preceding the day of the murder she went bowling and returned home at approximately midnight. Her daughter, Kelly, and Michelle Alling were asleep in Kelly's bedroom. Her son Gary was asleep on the living room couch and the television was on. She turned off the television and went upstairs to bed. Awakened during the night by the family dogs, she arose, put her coat over her night clothes, went downstairs, and let the dogs out. After a few minutes, she let the dogs in and returned to bed. She arose the next morning at

approximately 7:30, showered and washed her hair, went to the basement, turned on the clothes dryer for a few moments, removed a load of clothes from the dryer, folded them, and placed a load of clothes from the washer into the dryer. She went upstairs to dress, went into her daughter's room to borrow a pair of shoes, and left for work at approximately 8:30. She drove toward Central City Roofing, her place of employment, and stopped en route for a morning newspaper. She then went to Denny's restaurant, approximately one-half mile from Central City Roofing. She arrived at Denny's at approximately 9:00 A.M., entered the table area of the restaurant, ordered juice, eggs, ham, home fries and coffee, and was served by a chunky woman in her mid-forties. She arrived at her office at approximately 10:30.

The decedent was president of Central City Roofing. It was adduced at trial that he normally came to work at 10:00-10:30 A.M. When he had not appeared at the office by noon, defendant testified that she became concerned and inquired about him. A fellow employee said that he had talked to Pipines that morning at approximately 7:30. Shortly after 2:00 P.M. she called Pluto Poulios, Pipines' partner in Rochester, and told him that she had not heard from the victim and that she was going to contact the corporation's lawyer, William Mackay. When she called Mackay's office, she was informed that he was on vacation. Sometime thereafter she called Poulios again and he directed her to go to Pipines' home to see if something was wrong. They had both called the victim's home a few times during the course of the day but received no answer.

She left her office at about 3:30 and proceeded to the Pipines' residence. Approaching a side entrance near the garage, she knocked on the door and rang the doorbell. Receiving no answer, she went to the main entrance and rang that bell and knocked on windows. When she started to leave, she noticed that the victim's Mercedes was parked in a circular driveway to the right of the entrance drive and that a station wagon belonging to Billy Pipines, the victim's son, was also in the drive. She therefore went back to the house and once more rang the doorbell and knocked on the door. She opened the storm door on the entrance near the garage and when she tried the inner door, it opened. She then proceeded through the house calling Pipines' name. As she approached the master bedroom, she saw the victim lying on the bed with his back to her and thought he was asleep. She climbed on the bed behind him and attempted to turn him over by pulling on his shoulder. When she was unable to move him, she went to the other side of the bed where she was facing him.

She tried to push him, touching his neck to check for a pulse and noticed that his neck was warm. She then put her head down next to his and could see blood and what appeared to be vomit around his mouth and that his tongue was swollen. It was fairly dark in the room. She left the house and drove to the Fayetteville Mall where she used a pay phone to call Poulios. After she informed him that Pipines was dead, he told her to return to the house and call the police. After calling the police from the Pipines' residence, she went to the garage, opened the door and awaited the police in the garage.

### THE MURDER WEAPON

The victim was killed by a bullet which entered behind his right ear and emerged in front of his left ear. The spent bullet was caught in the victim's cupped left hand and fell from his hand when the body was moved a few inches by the police. It was later established that the bullet was fired from a .38 Derringer pistol belonging to defendant's common-law husband, which was found on March 5 in a grassy area of the Fayetteville Mall.

### THE FLAWS IN DEFENDANT'S STORY

#### (1) Defendant's account of discovering the body

Defendant's first story to the police was that, when she discovered the body, she attempted to give him mouth-to-mouth resuscitation. She later recanted that statement. She was unable, however, to make any significant changes in her first account that she had gotten on the bed behind decedent and tried to turn him over by tugging on his shoulder and then went around to the front of him, attempting to push him backward. In her trial testimony she conceded that she knew the victim was dead, but said that she thought he might have suffered a stroke. Examination of the pictures of the decedent makes graphically clear that no one viewing that body, the condition of the head and the substantial amount of blood on the sheet could possibly have failed to recognize immediately that the man had been shot. The prosecutor pointedly suggested in his cross-examination and on summation that defendant's account of the finding of the body was based on the way he appeared when she left him that morning after shooting him. At that time, he very likely had only a small wound behind the ear, had bled very little and would have looked as though he were sleeping. The medical examiner testified, however, that after the fatal shot was fired, the victim did not die instantly. Although in a comatose condition, he continued to bleed and the brain tissue oozed out of the puncture. When confronted with the pictures of decedent lying

in a large bloodstain with bloody tissue congealed on the back of his head, defendant attempted to account for her failure to see what was there to be seen by stating that it was dark in the bedroom. Yet that statement was rebutted by the testimony of police officers who entered the room approximately an hour after defendant supposedly had discovered the body. They stated that sunlight was streaming into the room through the adjacent conservatory and that there was sufficient light to read. Additionally, the police officer who first approached the body moved it only a few inches, thereby dislodging the spent bullet which had been caught in the victim's cupped left hand. It was thus obvious that if defendant had pulled and pushed the body as she described, the bullet would have fallen from his hand. Additionally, defendant's statement that the body felt warm was rebutted by the medical examiner's testimony that full rigor mortis had set in by the time the body was removed at 12:05 A.M. the following day, which indicated that the victim had been dead since at least noon. Defendant's entire defense hinged upon her credibility and the jury obviously found her story unbelievable.

There were other critical discrepancies in defendant's account of that afternoon. She testified that Poulios had called her twice at the office. On the first call they expressed concern over decedent and defendant told Poulios that decedent might have gone to a job site with William Mackay, the corporation's attorney. She told him that she would call Mackay's office. According to her, she then called Mackay's office and was told that he was on vacation. She became involved in some business matters until Poulios called her at approximately 3:30 and told her to go to the Pipines' residence. That version of the events was rebutted by Poulios and by telephone records which indicated that Poulios had called defendant only once, at 2:11 P.M., and it was at that time that he told her to go to the Pipines' residence. It thus became clear that defendant waited well over an hour before going to Pipines' home. Additionally, Mackay's secretary testified that defendant had called that office on Wednesday, the day preceding the murder, and was told on that day that Mackay was on vacation.

One other facet of defendant's account struck a discordant note. She testified that she approached the Pipines' residence that afternoon, parked her car in the drive, then went to both doors, ringing the bells and banging on the doors and windows. When she received no answer, she got in her car and started to leave but as she drove out the driveway, noticed decedent's car parked in the circular drive. Pictures of the residence and driveway illustrate that the Mercedes would be perfectly obvi-

ous to anyone driving into the driveway and going to the doors. She could not have failed to see his car when she first drove in. Yet, unexplainably, according to her story, she was not aware of it.

### (2) Defendant's alibi

Although the exact time of death was not established, it was determined that the victim had spoken to one of his employees at 7:30 that morning and that defendant arrived at work at 10:30. The period between those two points was critical. Defendant testified that she arose about 7:30, left the house at 8:30 or 8:45, picked up a newspaper, and drove to Denny's for breakfast. Michelle Alling, a guest at defendant's home, testified that she awakened at approximately 5:00 or 5:30 that morning, saw defendant with a coat and long garment, heard her go downstairs and heard the door open and close. When Michelle arose at 7:30 to let the family dogs out, she did not see defendant's car in the driveway nor hear or see her in the house. Defendant's son awakened at approximately 7:30, looked in his mother's bedroom, but did not see her. He left the house at 7:45 and did not see his mother's car in the driveway, although he specifically looked for it. The testimony of various co-workers of defendant established that she customarily arrived at work between 8:00 and 8:30, yet on this day, although she didn't leave her home until 8:30 or 8:45, she unexplainably went to Denny's for breakfast, something she admitted she had never done before, and stayed for over an hour reading the paper. She described the person who waited on her as a mid-forties chunky woman with dark hair. Yet the only woman of that description working there that day was working at the counter, not in the table area in which defendant testified she had sat, and did not have a check which reflected the food which defendant said she had ordered. Significantly, when questioned by the police on the night of the murder, defendant did not relate her trip to Denny's but stated she had arrived late for work because she had bowled the night before.

### (3) Evidence that defendant was with the victim on the morning of his death

According to defendant's testimony, decedent had delayed his return from Florida until the week of February 20 so that he could be alone at his residence since his wife and daughter remained in Florida and his sons were away in Texas. Defendant's husband was also scheduled to be away that week. The evidence established that defendant and decedent spent Monday

night together but were unable to be together on Tuesday night because defendant's husband returned briefly, then left once more on Wednesday. Yet defendant testified that she was unable to be with decedent on Wednesday night because she couldn't get a substitute for her bowling team and contended that she spoke with him for the last time on that Wednesday evening. Pipines was last heard from at approximately 7:30 A.M. on Thursday when he called his office to reach James Buck, an employee, who was supposed to replace locks at the Pipines' residence that morning. He was going to tell him not to come but was unable to contact him. When Buck arrived at approximately 8:45 A.M., he observed the victim's Mercedes parked in the circular driveway in front of the residence and found a note on the door telling him to return the next day.

Defendant's testimony was that it was customary for decedent to park his Mercedes in the circular drive when she was there so that she could drive her car into the garage where it would not be observed. Those facts certainly lent credence to the prosecutor's theory that Cynthia spent at least a portion of the night and/or morning with the victim. That is further supported by the fact that the victim was shot in the nude, apparently while sleeping. Moreover, the residence was equipped with an elaborate alarm system which was not triggered, there were no signs of a break-in or forced entry and nothing was disturbed or taken. There was testimony that defendant had been at the house on numerous occasions, was aware of the security system and had a key to a recently installed deadbolt lock.

### (4) The murder weapon

Defendant testified that on Wednesday, February 16, decedent had called her from Florida during the day and told her to be home that night to receive an important phone call. In order to receive the call, she obtained a substitute for her bowling team. When he called that night, the victim told her that he had had an argument with his wife, that he was going to leave his wife, begged her to take her daughter and go with him to Key West, and indicated that he was staying an extra week in Florida so that he could be alone in his home the following week. She said that they discussed an attempted break-in at his Fayetteville home that day and that he expressed a great deal of concern over the break-in and did not want to stay alone in the house without a gun. Therefore, he asked her to get a gun from her husband's gun cabinet and to take it with her when she picked him up at the airport on Sunday. Consequently, she took the Derringer from the locked gun cabinet and, because she

didn't know which bullets fit, she took two each of two different types, put them in a cosmetic bag, and put the bag in her purse. The victim did not return from Florida until Monday. Prior to going out with friends for dinner that evening, defendant and the victim, according to her testimony, went to his home where they had a drink. During the course of their conversation she gave him the gun and bullets which he took into the bedroom. The theory of the defense was that "gangland executioners" went into the victim's house and killed him with that gun and then disposed of it in the place where it was later found.

The testimony of other witnesses and a police report, however, established that the attempted break-in of Pipines' residence occurred on February 17, not February 16. Thus, the lengthy conversation with the decedent on the 16th could not have concerned the break-in as a reason for his requesting the gun. Confronted with the contradictory evidence, defendant insisted that the phone call on the 16th concerned the break-in but later conceded that the conversation must have taken place on February 18. Additionally, although telephone records established a lengthy call from Florida to defendant's residence on the 16th, the records reflected only one call to Central City Roofing on that day but it was after defendant stated she had left the office. Thus, decedent could not have told her to be home that night for an important call. Finally, the victim was a hunter, had guns of his own, was a successful and prominent businessman and certainly could have obtained a gun if he had desired to do so.

### (5) Evidence of motive

Defendant claims that the People failed to establish any motive for killing James Pipines. There is no requirement that the People establish motive; however, proof thereof is always a relevant consideration in assessing guilt based solely on circumstantial evidence (see, People v Moore, 42 NY2d 421, cert denied 434 US 987; People v Forestieri, 87 AD2d 523). There was proof at trial that defendant, who was secretary of the various corporations of which decedent was president, had drawn checks on a corporate account in large amounts payable to "petty cash" and had deposited corresponding amounts in her personal account. She admitted that she had accumulated approximately $10,000 in cash which she kept in the false bottom of a drawer in her bedroom. Defendant explained that she had saved that sum from her and her husband's paychecks over a six-month period. Nevertheless, the jury could reasonably have inferred that defendant had been stealing from Central City Roofing. Further, Pluto Poulios testified that he and decedent had discussed re-

placing defendant's assistant in the accounting department, Frank Pfau, with Douglas Lowden because Pfau was never able to "get close to the records" which were under defendant's control. Poulios testified that the decedent hoped that Lowden would be more successful in getting "closer to the books" and that he would eventually replace defendant as head of the accounting department. Significantly, Pipines had dinner with Lowden the evening before he was killed.

Moreover, although defendant claimed that decedent loved her, was going to leave his wife and several days earlier had asked her to marry him, there was contradictory proof. Only days before he was murdered, the victim had confided to a close friend that he had had a wonderful winter in Florida, that he had enjoyed being with his wife and family, and that it was becoming increasingly difficult for him to return to Syracuse. He stated that he was looking forward to celebrating his wedding anniversary with his wife in Florida the following weekend. There was thus sufficient evidence from which the jury could have inferred that defendant had a motive to kill Pipines, who, after a relationship of 12 years, was attempting to ease her out of his personal and business affairs.

### THE SUFFICIENCY OF THE EVIDENCE

■ Defendant contends that the evidence adduced at trial, wholly circumstantial in nature, was insufficient to establish her guilt beyond a reasonable doubt. When the evidence on which a defendant is convicted is purely circumstantial, such evidence must establish the defendant's guilt beyond a reasonable doubt and exclude to a moral certainty every reasonable hypothesis of defendant's innocence (*see, People v Way,* 59 NY2d 361, 365; *People v Kennedy,* 47 NY2d 196, 202). On review of a conviction, the People are entitled to a view of the facts more favorable to them and we must assume that the jury credited the prosecution's witnesses and gave the prosecution's evidence the weight to which it was reasonably entitled (*see, People v Kennedy, supra,* p 203; *People v Benzinger,* 36 NY2d 29, 32). Viewed from that perspective, the evidence against defendant was legally sufficient to establish her guilt (*see, People v Smith,* 63 NY2d 41; *People v Landers,* 107 AD2d 1022). Indeed, review of the record leads inexorably to the conclusion that defendant murdered James Pipines.

### THE PEOPLE'S FAILURE TO PROVIDE DEFENDANT
### WITH EXCULPATORY MATERIAL

Three days after the jury verdict was rendered, defense counsel learned that Patricia Kolbasook, a woman who did cleaning

work in various residences in decedent's neighborhood, had seen three men in a late model Lincoln driving out of decedent's driveway at approximately 9:15 on the morning of the murder. When she read of the victim's death, she went to the Manlius police station and gave an affidavit reporting what she had seen. Defense counsel moved to set aside the verdict on the ground that the People had improperly withheld exculpatory evidence to which she was entitled (*Brady v Maryland,* 373 US 83) and/or that the newly discovered evidence entitled her to a new trial. Defense counsel asserted by way of affidavit that the information in the Kolbasook affidavit had not been previously known to him and that, in response to his request for all exculpatory material, the prosecutor had responded that there was none. After a hearing, the court denied both prongs of defendant's motion. Defendant challenges that determination.

In *Brady v Maryland (supra),* the court held that where an accused has requested exculpatory evidence, the withholding of such evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith of the prosecution. The standard for determining materiality, in the constitutional sense, was established in *United States v Agurs* (427 US 97). The court distinguished between the situation in which a specific request of material is made and a case like the present in which only a general request for exculpatory information has been made. In the former, it held that the prosecutor should respond by either furnishing the information or submitting the problem to the trial court. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable" (*United States v Agurs, supra,* p 106). Where only a general request for exculpatory information has been made, the court found that such request was indistinguishable from a situation in which no request has been made so that if there is a duty to respond to such request, it must derive from the obviously exculpatory character of the evidence. The court established the following test: "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial" (*United States v Agurs, supra,* pp 112-113). That standard has been applied in New York and was recently articulated in *People v Smith* (63 NY2d 41, 67, *supra*) wherein the court stated, "[W]here the defense makes only a general request, or none at all, the failure to turn over obviously

exculpatory material violates due process only if the omitted evidence creates a reasonable doubt which did not otherwise exist."

Defendant urges that by whatever standard the issue of the materiality of undisclosed exculpatory evidence is measured, the court should have set aside the verdict and granted a new trial on the basis of newly discovered evidence because the omitted evidence would clearly have affected the jury deliberations. That is simply not the proper yardstick by which the asserted error is to be measured. Indeed, in *United States v Agurs* (*supra,* p 108), the court specifically rejected that approach which it denominated the " 'sporting theory of justice' ". As to the standard for determining when "newly discovered evidence" mandates a new trial, it must be "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 330.30 [3]). Since defendant was charged with only a single count of murder in the second degree, the only "more favorable" verdict which could have been rendered was an acquittal. In order to acquit defendant, the jury would have had to have a reasonable doubt as to her guilt and thus the standard of review of the omitted evidence is identical for both *Brady* considerations and those of newly discovered evidence. If the omitted evidence would have created a reasonable doubt where one did not otherwise exist, defendant would be entitled to a new trial.

■ The evidence which would have been introduced was that three men in a Lincoln were seen leaving the victim's driveway at around 9:15 on the morning of his death. Such evidence would certainly have bolstered defense counsel's theory that the victim's death was the result of a gangland execution. Whereas this association has a superficial appeal, it does not withstand scrutiny. There is not one shred of evidence to support the defense theory of a gangland execution. To the contrary, the evidence belies such theory. It strains credulity to believe that organized crime killers went to decedent's residence, fortuitously found the Derringer with which defendant had provided decedent, killed him with it, removed it from the premises although there would be nothing to connect them to the weapon, and transported it from the scene, planting it at the mall in an effort to implicate defendant. The mere statement of the proposition serves as its refutation. The evidence against defendant, although purely circumstantial, was compelling. As noted heretofore, defendant was entrapped by the many flaws in her story. To conclude that the omitted evidence would have been sufficient to overcome all

of the evidence pointing to defendant's guilt would be totally unreasonable.

Having decided that the withheld evidence does not meet the test of materiality set out in *Agurs* (*supra*), we would, nevertheless, be remiss if we did not comment on the prosecutor's failure to divulge this information to defense counsel. Considering the circumstantial nature of the proof, the People's theory regarding the time of death, and the defense theory of a gangland execution, it is inconceivable that the prosecutor would not have perceived this information as a valuable lead for the defense. The prosecutor must always be aware of the obligations arising from the public trust invested in him. His responsibility in a criminal prosecution "is not that [he] shall win a case, but that justice shall be done * * * [H]e is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer" (*Berger v United States, 295 US 78, 88*). The defense should have been provided with the material in question and its significance should not have been overlooked. In the final analysis, however, the focus is on the impact of the nondisclosure upon defendant's right to a fair trial and we find that the omission was not of such magnitude so as to constitute a deprivation of that right.

Although not necessary to our determination of this issue, we note that defense counsel could have made a specific request that the District Attorney turn over the Manlius police files containing the Kolbasook affidavit. Defendant hired an investigator who went to the police and asked for their reports and was told that they had been handed over to the District Attorney. Yet there was no follow-up request to the District Attorney. Thus, unlike the trial court, we believe that defendant could have produced the omitted evidence "with due diligence".

## THE INTEGRITY OF JURY SELECTION

In a newspaper account which appeared the day after the jury verdict, a woman juror was quoted as having told a reporter that, "Shanahan (defense counsel) never would have kept her as a juror had he been able to read her mind during the jury selection process. She said she originally thought Pugh was guilty." Defendant moved to set aside the verdict on that basis (CPL 330.30 [2]) and a hearing was held at which all of the women jurors were called as witnesses. One of the women jurors admitted that it was she who had spoken to the reporter and that she had told her that she held a pretrial opinion that defendant was in fact guilty. The court found that the newspaper article accurately reflected the juror's statement but that

there was no conflict between that statement and her voir dire testimony. Defendant challenges that determination.

Prior to jury selection the trial court indicated that it would ask prospective jurors if they held an opinion as to the guilt or innocence of the defendant without asking them to express what that opinion was. If the answer was in the affirmative, the court would ask the juror if he or she could put that opinion aside and decide the case solely on the merits. There was no objection to this procedure by either counsel and that line of questioning was pursued by counsel on voir dire. Examination of the transcript of the voir dire reveals nothing inconsistent between the juror's statement to the reporter and her replies on voir dire. Defense counsel asked her if she had formed an opinion prior to being called as a juror and she replied that she had. He did not ask her what that opinion was. She further stated that she could put that opinion aside and render a verdict based on the evidence introduced during trial. The only difference between those replies and her statement to the reporter was that she told the reporter what her opinion was. The juror stated by way of affidavit and in response to the court's questioning at the hearing that she had reached her verdict solely on the evidence introduced in the courtroom and that she had followed the instructions of law given by the court.

The authorities relied on by defendant are inapposite. In those cases where a verdict has been overturned because a juror was found ineligible to sit, it was established that the juror had lied about factual matters during voir dire (*see, e.g., People v Leonti,* 262 NY 256; *People v Howard,* 66 AD2d 670; *People v Harding,* 44 AD2d 800). Here, in contrast, there was no evidence that the juror had lied or concealed a preexisting bias; she simply was not asked what her opinion was. Even a juror who has formed an opinion as to guilt or innocence may be selected if he believes that it will not influence his verdict and that he can render an impartial verdict according to the evidence (*see, People v Genovese,* 10 NY2d 478, 481-482; *People v Ivery,* 96 AD2d 712). Defense counsel conducted a searching inquiry of the juror and was apparently satisfied with her declarations that she could put aside her opinion and render an impartial verdict based solely on the evidence adduced at the trial. A determination that she did not abide by her sworn declarations would be purely conjectural.

#### FAILURE TO ADMIT PROOF OF THREATS

Defense counsel made an offer of proof, out of the presence of the jury, whereby he sought to elicit testimony of Investigator

Murfitt of the State Police that he had been told by one Stevens, a business acquaintance of decedent, of threats made to the decedent. The court ruled such testimony inadmissible on grounds of hearsay. Defendant, while conceding that such testimony was hearsay, urges us not to employ a mechanistic application of the rule. The simple answer to this question is that the person to whom decedent allegedly communicated the information with respect to threats was known to defendant and indeed, his affidavit, supplied to the State Police, was handed over to defense counsel. It is clear from the offer of proof that counsel was not seeking to bring out the statements made by decedent or the source of the "threats", but merely seeking to place before the jury the fact that the police had been informed of the "threats". The reason becomes obvious when one looks at the substance of Stevens' communication which was that decedent had been having some "problems" with a woman and/or her husband. That information was clearly not the type of information which defense counsel would have found helpful whereas the bare testimony of Investigator Murfitt that he had been informed of threats against decedent would have meshed nicely with defense counsel's theory of a gangland execution. At any rate, Murfitt's testimony as to what Stevens told him that decedent had told Stevens would be double hearsay, incapable of verification or cross-examination, and we can think of no basis on which it should have been admitted (*see,* Richardson, Evidence §§ 200, 201, 206 [10th ed Prince]).

We have considered the various other points raised by defendant and find them to be without merit. Accordingly, there being sufficient proof of defendant's guilt and no errors requiring reversal, the judgment of conviction should be affirmed.

DILLON, P. J., DOERR, BOOMER and SCHNEPP, JJ., concur.

Judgment unanimously affirmed.