THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WILLIAM SEIFERT, Appellant.

Fourth Department, December 20, 1989

434

APPEARANCES OF COUNSEL

*Mark Mahoney* for appellant.

*Kevin M. Dillon, District Attorney (John De Franks* of counsel), for respondent.

### OPINION OF THE COURT

GREEN, J.

Defendant, William Seifert, was convicted of murder in the second degree for killing his younger brother, Mark Seifert. The People's theory at trial was that defendant lured Mark to an isolated rural area in Cattaraugus County on February 13, 1984, shot him in the head with a rifle and then disposed of his body. Although Mark has not been seen or heard from since that date, neither has his body been recovered. Defendant argues on appeal that the evidence, which is entirely circumstantial, is legally insufficient to support his conviction for murder in the second degree. He further argues that Erie

County lacked geographical jurisdiction to prosecute the murder charge, that the suppression court erred by failing to suppress certain evidence obtained during a search of his van, and that various trial errors deprived him of a fair trial.

On February 8, 1984, defendant asked Carol Reese, a waitress with whom he was acquainted, for a favor. He gave her a hand-written letter and asked her to pose as a secretary for Tri-State Developers, to telephone Mark Seifert, and to read the letter to him. Reese knew defendant only as "Bill" and defendant did not tell her that Mark Seifert was his brother. Reese reached Mark by telephone on Saturday, February 11, 1984. She read the letter, which informed Mark that he had been recommended to act as a contractor for a large recreational development project in Cattaraugus County. She asked him if he could meet with a Tri-State representative on Monday morning at 10:00 A.M. at a site located on Pleasant Valley Road in the Town of Yorkshire, an isolated rural area. Mark agreed to attend the meeting and Reese read to him detailed directions to get to the meeting site. She also told Mark that another contractor, who would be driving a blue van, was also expected to attend the meeting. Reese then telephoned defendant and told him that Mark would come to the meeting.

Although Reese had asked Mark to keep the meeting confidential, Mark told his landlady, his sister, and several others about it, expressing excitement that this would be his big financial break. According to his landlady, on February 12, 1984, Mark set his alarm for 6:00 A.M., and when she awoke at 9:00 A.M. on February 13, 1984, Mark was gone. He had taken his briefcase, but no other personal belongings with him. He was last seen by Burton Pleace, an acquaintance, at a diner located in Yorkshire Corners, about a 10-minute drive from the proposed meeting site. Mark told Pleace he was going to a meeting with a developer on Pleasant Valley Road and asked Please to verify the accuracy of his directions, which he had written on a piece of paper. Mark left the diner at approximately 9:25 A.M. Three persons who lived in the vicinity of Pleasant Valley Road and who were familiar with firearms heard a single rifle shot sometime between 9:30 A.M. and 10:00 A.M.

At 10:45 A.M., the Delevan Volunteer Fire Department was

dispatched to Pleasant Valley Road, where they discovered a car fully engulfed in flames. It was determined that the fire was started by use of an accelerant. The vehicle was identified as a Lincoln Continental, registered to Mark Seifert. An engraved cigarette lighter, which Mark had recently purchased, was found under the front seat. Despite an extensive inquiry conducted by the State Police, Mark Seifert has not been seen or heard from since February 13, 1984.

### INVESTIGATION AT THE SCENE

At the scene of the car fire, State Police investigators discovered two pools of blood, which were later discovered to contain what appeared to be bone fragments and brain tissue. Photographs were taken, and samples of the bone, tissue, and blood-stained wood chips were removed to the Erie County Medical Center for analysis. Several strands of a blue nylon-type fiber were located within 25 feet of the place where the blood, tissue, and bone were found. No evidence of human remains were detected inside the burned-out vehicle.

The blood was analyzed and determined to be of human origin, type O. Veterans Administration medical records document Mark Seifert's blood type as O. Four human enzymes were detected in the blood, including the PGM2 enzyme, which is found in only 6% of the population. Dr. Koeppen, a forensic pathologist, identified the tissue found on the scene as brain tissue from a large mammal, which appeared identical to human brain tissue. The tissue had hemorrhaged, which happens only in living tissue. The bone fragments, because of their size and shape, were consistent with a gunshot wound to the head. Tests performed revealed blood and human protein on the bone fragments. No nonhuman blood was detected at the scene. Dr. Justin Uku, Erie County Chief Medical Examiner, testified that the bone fragments found at the scene were consistent with the type of fragments that would result from a gunshot wound to the head. He further opined that the trauma capable of producing such fragmentation would be fatal.

### DEFENDANT'S ACTIONS

On Sunday, February 12, 1984, the day before Mark's alleged meeting with a representative of Tri-State Developers, defendant called two persons for whom he worked and told them that he would not be at work the following morning. He

left his home between 8:00 and 8:30 A.M. in his blue van, and did not arrive at a jobsite until sometime after noon on that day. On the evening of February 13, as part of the investigation into Mark Seifert's disappearance, State Police Investigator Mullins telephoned defendant. Defendant said that he drove a borrowed blue Cadillac to a local diner for breakfast that morning, then went to a health spa to work out. Defendant said nothing about Mark's meeting with a representative of Tri-State Developers. The following morning, Investigator Mullins visited defendant at his work site and asked him why he sounded so nervous during their telephone call the night before. Defendant stated that his nervousness was caused by the knowledge that 1 of his 2 vans was not registered properly. Defendant did not return home that evening or for six days thereafter.

That same evening, Carol Reese saw a television news report concerning the discovery of Mark Seifert's burning car in Cattaraugus County. She went to the police and stated that, at defendant's request, she had arranged for Mark to attend a business meeting at 10:00 A.M. at that location. She turned over to police the letter defendant had asked her to read to Mark. The following morning, when defendant had still not returned home, defendant's wife called the State Police and reported that defendant was missing. Both the blue van and defendant's white van were gone. According to defendant's wife, one of defendant's two "long guns" was also missing. On February 15, 1984, police located defendant's blue van in a supermarket parking lot in East Aurora. The license plates, registration and inspection stickers, and vehicle identification number tags had been removed.

Defendant returned home on February 20, 1984, and was interviewed by a State Police investigator in the presence of his attorney. Defendant denied any knowledge of Mark's present whereabouts. When confronted with the information from Carol Reese, defendant stated that he had received a call from a man named "Jim" who represented a Mr. Sandburg of Tri-State Developers in Pennsylvania. Jim told him that they wanted him and Mark to be the major contractors for a large recreational development project in the area of Pleasant Valley Road, and Jim insisted upon the participation of both brothers. Jim told defendant to contact Mark and set up a meeting for February 13 at 10:00 A.M. Because they had not been getting along very well, defendant feared that Mark would not agree to work with him, so he decided to have

Reese telephone Mark. Defendant felt that once Mark got there and realized the importance of the job, he would agree to work on the project. Defendant claimed he did not attend the meeting because Jim called him back and told him that due to adverse weather conditions, the developer had decided that only Mark need come to the meeting. Defendant admitted that he had been driving his blue van on Monday, February 13. He expressed the fear that someone had "set him up". He acknowledged familiarity with the Pleasant Valley Road area, but stated that he had not been down there for about 10 years.

William Strickland, who has known defendant for 15 to 18 years, indicated that every year his motorcycle club, of which defendant was a member, sponsored a cross-country race in the Yorkshire area that usually included Pleasant Valley Road. Defendant recently participated in the race and usually helped with the layout of the course. Subsequent police investigation revealed that defendant had not signed in at his health club on the morning of February 13.

### THE VAN

Pursuant to a consent form signed by defendant's wife, the State Police impounded and searched defendant's blue van, which they had located in the supermarket parking lot. A piece of carpet from the rear of the van nearest the back door appeared to be newly cut away. Wood chips were found in the rug near the driver's seat. The rug was made of blue nylon. Fibers from the rug and the fibers found at the scene were tested and found to match. The rugs in the van also contained a significant number of orange-colored polyester fibers, testing of which revealed a strong association with an orange polyester fiber found at the scene.

Ralph Marcuccio, a forensic scientist and serologist, found human blood on fabric and wood shavings removed from the rug in defendant's van which contained the PGM2 enzyme.

### DISCUSSION OF LEGAL SUFFICIENCY OF THE EVIDENCE

In *People v Lipsky* (57 NY2d 560, *rearg denied* 58 NY2d 824), the Court of Appeals overruled the common-law rule, enunciated in *Ruloff v People* (18 NY 179), that a defendant cannot be convicted of murder without direct proof of death and of the criminal agency which produced death. The court held that "the corpus delicti may be established by circum-

stantial evidence" *(People v Lipsky, supra,* at 569). Therefore, the failure to locate Mark Seifert's body is not an impediment to conviction, so long as the circumstantial evidence is sufficient to prove beyond a reasonable doubt that defendant intentionally killed him.

■ When reviewing a case based exclusively upon circumstantial evidence, the facts must be viewed in the light most favorable to the People *(People v Morgan,* 66 NY2d 255, 256, *on remittitur* 116 AD2d 919, *cert denied* 476 US 1120), and it must be assumed that the jury credited the People's witnesses and gave the People's evidence "the full weight that might reasonably be accorded it" *(People v Benzinger,* 36 NY2d 29, 32; *People v Pugh,* 107 AD2d 521, 529, *lv denied* 67 NY2d 764). Moreover, a conviction based entirely upon circumstantial evidence "is subject to strict judicial scrutiny, not because of any inherent weakness in this form of evidence, but to ensure that the jury has not relied upon equivocal evidence to draw unwarranted inferences or to make unsupported assumptions" *(People v Way,* 59 NY2d 361, 365). The facts from which the inference of defendant's guilt is drawn, when perceived as a whole, must overwhelmingly establish his guilt beyond a reasonable doubt, must be inconsistent with his innocence, and must exclude to a moral certainty every other reasonable hypothesis *(People v Morgan, supra; see also, People v Lewis,* 64 NY2d 1111, 1112; *People v Sanchez,* 61 NY2d 1022, 1024; *People v Way, supra; People v Benzinger, supra).* The reason for the application of this rule is to foreclose "a danger legitimately associated with circumstantial evidence—that the trier of facts may leap logical gaps in the proof offered and draw unwarranted conclusions based on probabilities of low degree" *(People v Benzinger, supra,* at 32; *see also, People v Cleague,* 22 NY2d 363, 367).

Defendant identifies three questions that must be answered in the affirmative by the jury in order to sustain his conviction for second degree murder. The questions, as framed by defendant, are: (1) Was someone killed? (2) Was that person Mark Seifert? (3) Was defendant Mark Seifert's killer? Defendant argues that none of these questions could have been answered affirmatively by the jury based upon the evidence presented at trial unless the jury engaged in improper speculation and based inferences upon inferences, not upon proven facts. Defendant claims that the law requires that each inference drawn by the jury must be based upon testimonial or other direct evidence. We find that defendant has overstated

the requirement of the rule. The commentators have noted that the prohibition against basing an inference upon an inference, found in the case law, is merely a restatement in different terms of the principle that a jury cannot be allowed to "make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best" *(People v Kennedy,* 47 NY2d 196, 202, *rearg dismissed* 48 NY2d 656). As articulated by one commentator:

"Hence, when this phrase [basing an inference upon an inference] is used in a criminal case, for example, all that it means is that the circumstances introduced to prove the controverted issues are not consistent with guilt and inconsistent with a reasonable hypothesis of innocence, or do not exclude to a moral certainty every other reasonable hypothesis.

"To the extent that it implies that every inference must be based directly upon testimonial evidence without any intervening inferences, the phrase is misleading and its use should be discontinued" (Fisch, New York Evidence § 164, at 94 [2d ed]; *see also,* Richardson, Evidence § 148, at 118-119 [Prince 10th ed]).

We find that the evidence admitted at defendant's trial compels an affirmative answer to each of the questions framed by defendant, and does so in full accord with the rules that apply in circumstantial evidence cases.

1. *Did a human die?*

■ Proof of death may be established by circumstantial evidence *(see, People v Lipsky, supra).* The evidence in this case establishes to a moral certainty that a human being died at Pleasant Valley Road on February 13, 1984. Three local residents testified that they heard a single rifle shot between 9:30 and 10:00 A.M. that morning. Two pools of blood were discovered near Mark Seifert's car, and these pools contained what appeared to be tissue and bone fragments. The blood was human type O blood. The tissue was identified as brain tissue, consistent with human brain tissue. The tissue had hemorrhaged, and was living tissue when this hemorrhaging occurred. The size and shape of the bone fragments were consistent with a head injury caused by a projectile. Dr. Koeppen opined that the presence of this quantity of brain tissue and bone fragment meant that the wound was most likely fatal. This conclusion was also reached by Dr. Uku, Chief Medical

Examiner for Erie County, who opined that the bone fragments found at the scene were consistent with fragments produced by a gunshot wound to the head, and, in his opinion, the wound was fatal.

This evidence, when viewed in its entirety, overwhelmingly establishes that a human being with type O blood suffered a fatal gunshot wound to the head. Moreover, the proof, when viewed in the light most favorable to the prosecution, excludes to a moral certainty all other reasonable hypotheses. Although the brain tissue and bone fragments were not identified conclusively as human, they were found in a pool of human blood. Dr. Koeppen testified that if an animal had suffered a head wound resulting in the loss of brain tissue, the animal would have bled from the wound. No nonhuman blood was found at the scene. This evidence excludes the possibility suggested by defendant that an animal death was the source of the blood and bone fragments.

2. *Did Mark Seifert die?*

██ The evidence adduced at trial proves to a moral certainty that Mark Seifert is dead and excludes all other reasonable hypotheses. Mark agreed to attend a meeting at 10:00 A.M. on the very site where his car was found. He left home with only the clothes he was wearing. He did not take a suitcase, or any other personal effects from his room. About 9:00 A.M., Mark was seen by an acquaintance at a diner in Yorkshire Corners, about a 10-minute drive from the scene of the fire. Mark told his acquaintance that he was on his way to a meeting with a developer on Pleasant Valley Road. He left the diner before 9:30 A.M. At or near 10:45 A.M., the fire department was dispatched to Pleasant Valley Road. Mark's car was totally engulfed in flames and his monogrammed cigarette lighter was found under the front seat. Blood found at the scene was type O, which is Mark's blood type. Mark never returned to his home, nor has he contacted any family members or friends. The proof logically leads to the conclusion that Mark Seifert was killed on Pleasant Valley Road that morning. Defendant argues that the proof equally supports the conclusion that Mark left the area without telling anyone, because Mark had left the area before for long periods of time. However, various family members testified that, although Mark had moved from the area on prior occasions, he telephoned them and sent post cards and gifts during his absence. This evidence, viewed in the light most favorable to the

People, excludes defendant's theory that Mark left the area voluntarily.

### 3. *Did defendant kill Mark Seifert?*

■ Finally, we find that the evidence adduced at trial establishes to a moral certainty that defendant killed his brother. Defendant was responsible for luring Mark to the Pleasant Valley Road site, using Carol Reese as his intermediary. The letter defendant gave Reese to read to Mark contains detailed directions which lead precisely to the spot where Mark's vehicle was found. Defendant called his employers the night before and told them that he would not be working for them on the morning of February 13. Defendant left his home early that day and no one could verify his whereabouts until he arrived at a jobsite sometime after noon. He was driving his blue van, which he admitted had been in his exclusive possession that day. This van contained a blue nylon rug, and fibers from this rug matched blue nylon fibers found at the scene. The rug in defendant's van contained a quantity of orange polyester fibers, which were strongly associated with an orange polyester fiber found on the scene. Traces of human blood were detected on wood chips and fiber found in the van, and the blood on the wood chips contained the human blood enzyme PGM2, which occurs in only 6% of the population. This enzyme was also detected in the blood found at the scene. Thus, defendant was linked to the scene by a continuous chain of physical evidence.

Although there is no requirement that the People establish motive, motive is always a relevant consideration in cases based solely upon circumstantial evidence *(People v Pugh, supra,* at 528). The evidence demonstrates that defendant hated his brother Mark because Mark was a homosexual and because they had been on opposite sides of family disputes. Mark had filed criminal charges against defendant in the Elma Town Court, and these charges were pending on February 13, 1984. Defendant's twin brother, Ted, testified at trial that he overheard defendant say: "It will never get to Court; I will kill the bastard first".

The actions of defendant after Mark's burned car was discovered demonstrated consciousness of guilt. Evidence of consciousness of guilt has been labeled a "relevant but weak form of evidence" *(People v Benzinger, supra,* at 33; *see also, People v Leyra,* 1 NY2d 199, 208-209). However, in an appropriate case, evidence of consciousness of guilt bolsters other

circumstances which in and of themselves strongly point to the defendant's guilt *(People v Leyra, supra,* at 208). This is such a case. When a State Police officer initially spoke with defendant on the day Mark's car was discovered, defendant did not mention Mark's meeting with Tri-State Developers. Defendant told the officer that he had been driving his cousin's blue Cadillac that morning. The following day, after a second interview with the State Police, defendant removed all identifying markings from his blue van, abandoned it in a local supermarket parking lot, and left for Florida. When he returned six days later, and only after being informed that Carol Reese had gone to the police, defendant admitted to writing the letter. Moreover, defendant owned a high-caliber rifle, which was missing from the place it was usually kept in his home during the time he was in Florida. These facts, when viewed in their entirety, overwhelmingly establish defendant's guilt beyond a reasonable doubt and are inconsistent with innocence, and exclude to a moral certainty every other reasonable hypothesis.

## GEOGRAPHICAL JURISDICTION

■ Defendant argues that Erie County lacks geographical jurisdiction to prosecute him for a murder that took place in Cattaraugus County. CPL 20.40 (1) (a) provides that a county has geographical jurisdiction to prosecute an offense if "[c]onduct occurred within such county sufficient to establish * * * [a]n element of such offense". In a previous appeal by the People from the dismissal of the indictment against defendant, this court held that the People had established by a preponderance of the evidence that defendant had formed the intent to kill Mark Seifert in Erie County *(see, People v Seifert,* 113 AD2d 80, *lv denied* 67 NY2d 889; *see also, People v Tullo,* 34 NY2d 712). We find that the evidence before the jury likewise reveals conduct by the defendant within Erie County sufficient to establish that the intent to kill was formed in Erie County. The jury's finding of geographical jurisdiction to prosecute the murder charge in Erie County is fairly and reasonably inferred from all the facts and circumstances and is supported by a preponderance of the evidence *(see, Matter of Steingut v Gold,* 42 NY2d 311).

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FOUND IN THE VAN

■ Defendant's motion to suppress evidence found during a

police search of his van was properly denied. The testimony of the officers, as developed at a suppression hearing, was that defendant's wife identified the blue van discovered in a supermarket parking lot as "our van", executed a waiver form, which described the van as belonging to her and her husband, and gave her consent to search the van. This testimony supports the court's determination that the officers reasonably relied upon Mrs. Seifert's representations of joint ownership to search the van (see, People v Adams, 53 NY2d 1, 8-10, cert denied 454 US 854). Although Mrs. Seifert testified at the suppression hearing that she told the officers that the van belonged to her husband and that she lacked authority to consent to a search, the court found her testimony to be unworthy of belief. The court's determination of the credibility of witnesses should be accorded great weight (see, People v Rucker, 144 AD2d 943, lv denied 73 NY2d 926).

### FAIR TRIAL

■ Defendant also argues that he did not receive a fair trial. His first contention is that the jury erroneously considered the testimony of the serological expert concerning his analysis of wood chips and fibers taken from defendant's van. Defendant claims that the wood chips and fibers were not admitted into evidence. Although the court refused to admit the samples into evidence at the conclusion of the witness' testimony, defense counsel did not move to have the testimony stricken. Moreover, during jury deliberations, when the jury requested that this testimony be reread to them, defense counsel did not object. Therefore, defendant has failed to preserve this issue for review (CPL 470.05 [2]) and we decline to reach it in the interests of justice.

The remaining issues raised by defendant were not preserved for our review and lack merit in any event. Therefore, the judgment should be affirmed.

BOOMER, J. P., PINE, LAWTON and DAVIS, JJ., concur.

Judgment unanimously affirmed.