OPINION OF THE COURT
 

 Levine, J.
 

 In the early hours of August 27, 1993, Aiman Badawi was discovered lying in a remote, desolate location in Queens, semiconscious and covered in his own blood, the victim of multiple gunshot wounds. Among his other injuries, Badawi suffered a head wound from a bullet that entered his right temple, passed across both frontal lobes of his brain and exited his left temple. This injury left Badawi with no memory of the moments immediately preceding the shots, although he was able to recall the pertinent events that occurred prior to that point.
 

 Defendant Joseph Ficarrota and Angelo Boccadisi, who employed defendant as his bodyguard, were jointly indicted for the attempted murder and first degree assault of Badawi. Boccadisi absconded and the case proceeded to joint trial, Boccadisi being tried in absentia.
 

 At the trial, Badawi testified that, in 1992, he went into business with a woman named Han Ye Yang (also known as Mimi), owning and operating two booths at Caesar’s Bay Bazaar in Queens where they sold scarfs, handbags and other items. In July of the same year, after Badawi had loaned Mimi $10,000 and before the loan was repaid, Boccadisi (who is Mimi’s ex-husband and the father of her child) and defendant (who was introduced to Badawi as Phil) came to see Badawi at Caesar’s Bay. Boccadisi informed Badawi that one of the booths had been closed by "connections.” Defendant then opened his suit jacket, brandishing a gun. He grabbed Badawi by the collar, lifting him, and threatened: "You better listen to Angelo because you have no idea what is going to happen to you.” Later the same day, Badawi discovered threatening messages on his answering machine from Boccadisi, warning him to leave Mimi alone and not to expect to get his money back.
 

 In May of 1993, Badawi arranged to sell his share of the business to Mimi and one of her friends. After a dispute arose over payment for the booths, Badawi removed approximately $13,000 worth of merchandise from one of the booths without permission from Mimi or her partner. Mimi was enraged and confronted Badawi, kicking him and screaming at him for stealing the merchandise.
 

 
 *247
 
 Later that summer, Mimi apparently requested the intervention of her ex-husband, Boccadisi, in connection with her dispute with Badawi. On or about August 19, 1993, Mimi asked Badawi to meet a buyer for the merchandise in Badawi’s possession. When Badawi arrived at the designated meeting place, however, only Boccadisi was present. Boccadisi told Badawi that he had a potential buyer for the merchandise and asked Badawi to meet him again the following evening and to bring some sample handbags. The next evening, Boccadisi appeared and took Badawi to a restaurant, stopping first to pick up defendant, who greeted Badawi and apologized for his behavior the previous summer. Over dinner and drinks, Boccadisi initiated a discussion about their going into business together. He told Badawi to scout out some potential locations in Manhattan for their proposed business. After paying the bill, Boccadisi suggested that they meet again that Thursday, August 26, 1993, for further discussion of the business venture. The next morning, defendant went alone to see Badawi to return the sample merchandise and to finalize the arrangements for the Thursday meeting.
 

 On August 26, 1993, Boccadisi and defendant picked up Badawi and, at Boccadisi’s direction, visited several of the locations that Badawi identified as possible sites for the proposed business venture. Afterwards, Boccadisi and defendant took Badawi to a bar for a drink. On the way back from Manhattan, defendant and Boccadisi continued to talk about the business enterprise, deciding on a site and discussing how long it would take defendant to get the place ready. At one point, Boccadisi asked Badawi if he minded taking the Midtown Tunnel and, when Badawi did not object, Boccadisi took the tunnel, but then exited, detouring into a secluded area of Queens.
 

 When Boccadisi stopped the car, Badawi, frightened by surroundings which he described as "worse than an Egyptian desert,” asked the reason for the stop. Boccadisi replied, "engine trouble.” Badawi did not believe him and became very nervous, whereupon defendant began patting Badawi on the shoulder. Defendant said, "Aiman, you take care of yourself,” and started to get out of the car. Alarmed, Badawi asked where defendant was going, pointing out that the area was dark and there was no other available means of transportation. Defendant placated, "I have to go somewhere, and, please don’t hesitate to bring your girlfriend or your fiancée, if you have one, to my restaurant and the meal will be on the house.” Badawi then watched defendant walk away from the car.
 

 
 *248
 
 While defendant was speaking to Badawi, Boccadisi left the car, walked to the rear and opened the trunk. He reappeared wearing a white jacket which he held closed with one of his hands. Badawi’s recollection of the night of August 26, 1993 does not extend beyond this point. However, he testified that after being released from the hospital, he went back to Caesar’s Bay to find Mimi. When she saw Badawi, she began shaking and exclaimed, "you are still alive?”
 

 Several months later, Badawi received $2,500 in the mail from Boccadisi, unsolicited. The police then arranged for the recording of telephone conversations between Badawi and Boccadisi in which the latter mixed implicit threats and promises of reward to induce Badawi to refrain from implicating him and defendant in the shooting.
 

 At trial, defendant denied any participation in the crime and testified that he and Boccadisi were at his mother’s home at the time the shooting occurred. His mother corroborated this testimony. Nevertheless, the jury convicted both defendant and Boccadisi of attempted murder in the second degree and two counts of assault in the first degree
 
 (see,
 
 Penal Law §§ 110.00, 125.25 [1]; § 120.10 [l]-[2]). The Appellate Division reversed defendant’s conviction, holding that there was no evidence in the record that defendant intentionally assisted Boccadisi in shooting the victim or that he shared a community of purpose with Boccadisi (234 AD2d 383). A Judge of this Court granted the People leave to appeal, and we now reverse.
 

 The issue before us is whether the evidence was legally sufficient to support the jury’s verdict. Specifically, we must decide whether the Appellate Division erred in concluding that no rational trier of fact could have found that defendant had the requisite knowledge or shared a "community of purpose” with Boccadisi as required for accomplice liability
 
 (see,
 
 Penal Law § 20.00;
 
 People v Allah,
 
 71 NY2d 830, 832) and that he actually "intentionally aid[ed]” Boccadisi in the shooting (Penal Law § 20.00).
 

 It is well settled that "[t]he standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt’ ”
 
 (People v Contes,
 
 60 NY2d 620, 621, quoting
 
 Jackson v Virginia,
 
 443 US 307, 319 [emphasis in original];
 
 see, People v Howard,
 
 87 NY2d 940, 942;
 
 People v Cabey,
 
 85 NY2d 417, 420). This is the appropriate
 
 *249
 
 standard of review even when, as here, the evidence introduced against the defendant is circumstantial
 
 (see, People v Rossey,
 
 89 NY2d 970, 971;
 
 People v Cabey, supra,
 
 at 421).
 

 Badawi’s testimony, if credited by the jury, readily supports the conclusion that Boccadisi had been the perpetrator of the attempted murder, in retribution for Badawi’s engaging in a business dispute with Boccadisi’s former wife. Moreover, there is record evidence, giving all favorable inferences to the People
 
 (see, People v Contes, supra,
 
 60 NY2d, at 621), of defendant’s complicity.
 

 First, there is evidence that defendant previously threatened Badawi over a business dispute with Mimi. The jury could have concluded that a renewal of that dispute (and specifically the fact that Mimi believed that Badawi had stolen $13,000 worth of merchandise from her) precipitated the attempt to murder Badawi. Thus, defendant’s and Boccadisi’s sudden, renewed interest in Badawi after the revival of Badawi’s conflict with Mimi is probative of defendant’s motive, i.e., to punish Badawi for presumed affronts to Mimi
 
 (see, People v Levine,
 
 65 NY2d 845, 847 [evidence of motive is a factor supporting conviction],
 
 rearg denied
 
 65 NY2d 1054).
 

 In view of the renewal of Badawi’s dispute with Boccadisi’s ex-wife, the jury could have readily inferred that the business proposal initiated by Boccadisi and defendant was not sincere, but merely a ploy to lull him into a false sense of security until their arrival at the remote area where the risk of discovery of the contemplated murder would be minimal. There is significant evidence that defendant participated in these efforts to gain Badawi’s trust. At the August 20, 1993 dinner meeting, defendant apologized to Badawi for his earlier threat and, the following day, it was defendant who made the final arrangements to meet with Badawi the night he was shot. Defendant further participated in the ploy by discussing the joint business venture, including his own role in it, on the way to the scene of the crime and, once there, by physically and verbally calming Badawi.
 

 Moreover, defendant’s conduct at the crime scene immediately before the shooting — abandoning his employer who was ostensibly having "engine trouble” in a deserted area with no other means of transportation — could be viewed as highly unnatural behavior for a person without knowledge that the stop was a ruse for what his employer was about to do.
 

 Finally, any doubts the jury may have had concerning defendant’s complicity with Boccadisi’s execution-style murder
 
 *250
 
 attempt would be further allayed by the fact that he gave a false alibi not only for himself but for Boccadisi as well. "Defendant’s false statements are not only evidence of consciousness of guilt of some crime, but also show defendant’s attempts to distance himself from the time and place of the [specific crime at issue]”
 
 (People v Levine, supra,
 
 65 NY2d, at 847;
 
 see also, People v Benzinger,
 
 36 NY2d 29, 33-34). These facts, taken together, are sufficient to form the basis of the jury’s conclusion that defendant was aware of, and knowingly participated in, the murder attempt
 
 (see, People v Rossey, supra,
 
 89 NY2d, at 972;
 
 People v Williams,
 
 84 NY2d 925, 926-927), and that the defendant shared a community of purpose with Boccadisi in plotting and executing the crime
 
 (see, People v Cabey, supra,
 
 85 NY2d, at 421-422;
 
 People v Whatley,
 
 69 NY2d 784, 785).
 

 The jury, moreover, could not only infer defendant’s knowledge of Boccadisi’s plot to murder Badawi, but his accessorial conduct. As noted above, there is record support that defendant played a role in setting up the fateful meeting
 
 (cf, People v Cabey, supra,
 
 85 NY2d, at 421) and that he actively participated in deceiving Badawi by pretending that there was a legitimate business purpose for the August 26, 1993 evening excursion. Finally, the jury could have inferred that defendant purposely distracted Badawi while Boccadisi prepared to shoot him.
 

 Accordingly, the order of the Appellate Division should be reversed, and the case remitted to the Appellate Division for consideration of the facts and issues raised but not determined on the appeal to that Court.
 

 Chief Judge Kaye and Judges Titone, Bellacosa, Smith, Ciparick and Wesley concur.
 

 Order reversed, etc.