[928 NYS2d 114]

The People of the State of New York, Respondent, v Calvin L. Harris, Appellant.

Third Department, July 28, 2011

**APPEARANCES OF COUNSEL**

*Easton, Thompson, Kasperek & Shiffrin, L.L.P.*, Rochester (*William T. Easton* of counsel), for appellant.

*Gerald A. Keene, District Attorney*, Owego, for respondent.

**OPINION OF THE COURT**

MERCURE, J.

Following a lengthy trial, defendant was convicted in 2007 of murder in the second degree for killing his wife, Michele Harris (hereinafter the victim), who was last seen on September 11, 2001. Neither the victim's body nor any murder weapon has ever been found. Within hours after the verdict, an individual, Kevin Tubbs, came forward alleging that he had information relevant to the victim's disappearance. Defendant's ensuing CPL 330.30 motion to set aside the verdict was granted, and a new trial was ordered (*People v Harris*, 55 AD3d 958 [2008]). Following the second trial, defendant was again found guilty of murder in the second degree. County Court denied his subsequent motion to set aside the verdict, and sentenced him to a prison term of 25 years to life. Upon defendant's appeal, we now affirm.

■ Initially, we reject defendant's argument that his conviction is not supported by legally sufficient evidence and is against the weight of the evidence. The proper standard for appellate

review of a conviction based on wholly circumstantial evidence is the same as in any other criminal case: "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*People v Ficarrota*, 91 NY2d 244, 248 [1997] [internal quotation marks and citations omitted]; *see People v Hines*, 97 NY2d 56, 62 [2001]; *People v Wong*, 81 NY2d 600, 608 [1993]). While the danger that the trier of fact may leap logical gaps in the People's proof forms the basis for the circumstantial evidence charge to be given to the jury, the Court of Appeals has clarified that the standard set forth in that charge is only for the trier of fact, rather than an appellate court reviewing legal sufficiency (*see People v Hines*, 97 NY2d at 62; *People v Norman*, 85 NY2d 609, 620-622 [1995]; *People v Williams*, 84 NY2d 925, 926 [1994]; *see also People v Rossey*, 89 NY2d 970, 971-972 [1997]; *People v Wong*, 81 NY2d at 608). Thus, it is settled that " '*the jury* should be instructed in substance that it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence' " (*People v Ford*, 66 NY2d 428, 441 [1985] [emphasis added], quoting *People v Sanchez*, 61 NY2d 1022, 1024 [1984]). In contrast, although close judicial supervision may be necessary in circumstantial evidence cases, the appellate courts' function in reviewing legal sufficiency remains limited to assessing solely " 'whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People' " (*People v Hines*, 97 NY2d at 62, quoting *People v Williams*, 84 NY2d at 926; *see People v Norman*, 85 NY2d at 620-621).

Further, "the People are entitled to the benefit of every reasonable inference to be drawn from the evidence" (*People v Cintron*, 95 NY2d 329, 332 [2000]; *see People v Hines*, 97 NY2d at 62).[1] As a practical matter, then, we must "assume that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it" (*People v Benzinger*, 36 NY2d 29, 32 [1974]; *see People v Bieren-*

---

1. In our view, the dissent errs by applying the heightened standard that is reserved only for the trier of fact, failing to view the evidence in the light most favorable to the People, and confusing weight of the evidence review with a legal sufficiency analysis.

*baum*, 301 AD2d 119, 131 [2002], *lv denied* 99 NY2d 626 [2003], *cert denied* 540 US 821 [2003]). In reviewing legal sufficiency, we also must be mindful that "[t]he possibility that someone other than [defendant] may have committed the crime does not preclude a guilty verdict"; even in circumstantial evidence cases, "the jury [remains] free to assess the evidence and to reject that which it finds to be nonpersuasive" (*People v Ford*, 66 NY2d at 437). That is, "it is for the jury to determine what evidence is to be believed and what evidence is to be discredited, as long as that decision does not involve any logical inconsistencies" (*People v Kennedy*, 47 NY2d 196, 204 [1979]). Acquittal is not mandated in a circumstantial evidence case simply because "every bit of evidence submitted to the jury [is not] inculpatory rather than exculpatory" (*id.*), or because certain evidence, "when . . . evaluated in isolation, [is] susceptible to arguable inferences which at first blush seem consistent with [a] defendant's claim of innocence" (*People v Bierenbaum*, 301 AD2d at 132). Rather, we must review all the evidence presented as a whole, "cast in its aggregated and interwoven symmetry, and after applying all natural and reasonable inferences" that favor the People (*id.* at 132-133), determine whether the jury could logically conclude that the elements of the crime were proven beyond a reasonable doubt.

Viewed under that standard, the proof herein is legally sufficient to establish that defendant intentionally caused the death of the victim at their home on the night of September 11, 2001. Specifically, although there is no direct evidence, the People demonstrated defendant's guilt through circumstantial proof of motive, intent, opportunity and consciousness of guilt, as well as evidence of the victim's sudden disappearance and her spattered blood in the garage and kitchen in the family home.[2]

Turning first to motive, defendant is correct that such evidence "does not establish any element of the crime, and cannot take the place of proof of [defendant's] actual commission of the crime" (*People v Marin*, 65 NY2d 741, 745 [1985]). Nevertheless, that truism does not provide a basis for discounting the evidence of motive here. Indeed, "evidence of . . . motive *cannot be ignored* in examining the evidence in the light most favorable to the prosecution" (*id.* [emphasis added]; *see People v Kimes*,

---

2. Defendant correctly concedes, as he must, that it is well settled in New York that a conviction for homicide is not dependent upon the production of the body of the victim and may be proved solely by circumstantial evidence (*see People v Lipsky*, 57 NY2d 560, 569 [1982]).

37 AD3d 1, 13-14 [2006], *lv denied* 8 NY3d 881 [2007]; *People v Bierenbaum*, 301 AD2d at 135; *People v Seifert*, 152 AD2d 433, 443 [1989], *lv denied* 75 NY2d 924 [1990]). Particularly in circumstantial evidence cases, " 'motive often becomes not only material, but controlling' " (*People v Toland*, 284 AD2d 798, 804 [2001], *lv denied* 96 NY2d 942 [2001], quoting *People v Fitzgerald*, 156 NY 253, 258 [1898]; *see People v Thibeault*, 73 AD3d 1237, 1239-1240 [2010], *lv denied* 15 NY3d 810 [2010], *cert denied* 562 US —, 131 S Ct 1691 [2011]).

The record demonstrates that at the time of the victim's death, her marriage to defendant was nearing its end, and the two were in the midst of unsuccessfully attempting to negotiate a divorce settlement. The marriage was marked by infidelity; both defendant and the victim were having intimate relationships with other people prior to the commencement of divorce proceedings. When the victim initially told defendant on December 8, 2000 that she wanted a divorce, he reacted explosively. The victim's sister-in-law, who telephoned that evening, reported hearing defendant screaming at the victim, as she pleaded with him not to come near her and attempted to flee. Despite defendant using his truck to block the victim's car in the family garage, she was eventually able to retreat to the home of her brother and sister-in-law. Shortly thereafter, the victim removed all of defendant's guns from the family's house and brought them to her brother's home.

Although defendant and the victim had four young children and she did not work outside the home during the marriage, defendant stopped providing her with money once she announced her intention to divorce him. The victim took a job as a waitress at a local restaurant, and continued to live separately from defendant within the family home. Defendant contacted the victim's friends and family, seeking assistance in convincing her to discontinue the divorce proceedings, and declared that "there wasn't going to be a divorce and she wasn't going to get half of his business."[3] Although he also informed the victim's family of his concerns regarding her drug use, he told them that he blamed the victim for his own unfaithfulness with other women, citing the victim's failure to keep the family home clean. Ultimately, Supreme Court directed defendant to pay various bills, as well as $10,000 in counsel fees for the victim's attorney

---

**3.** An interim decision issued in the divorce action indicated that defendant had not challenged the victim's allegation that his net worth was approximately $5.4 million.

and $400 per week in maintenance to the victim, and scheduled the case for a jury trial in October 2001.

Settlement negotiations between defendant and the victim throughout the summer of 2001 were unsuccessful. In August 2001, the victim rejected defendant's final settlement offer that would have resulted in an award of custody of the children to the victim and $740,000, with $200,000 to be paid to her immediately and $54,000 per year for a period of 10 years. Rather than accept that offer, the victim filed an order to show cause approximately one month before the murder, requesting an appraisal of defendant's automobile dealerships and $30,000 for the appraisal fee. In light of these circumstances, the jury could rationally conclude that defendant had a motive to kill the victim—i.e., avoiding the expensive, impending appraisal of his business and the trial scheduled for October 2001, as well as preventing the divorce itself and concomitant equitable distribution of his assets (*see People v Bierenbaum*, 301 AD2d at 135).

The proof of intent is closely related to evidence of motive in this domestic violence homicide case. The People argued that defendant's intentional murder of the victim was the culmination of a cycle of abusive, controlling behavior that intensified after she rebuffed his attempts to prevent the divorce.[4] In support of that theory, they offered evidence of defendant's prior threatening and intimidating behavior toward the victim. Apart from defendant's explosive reaction when the victim told him in December 2000 that she wanted a divorce, the most notable evidence came from the victim's hairdresser, Jerome Wilczynski. He testified regarding a telephone conversation that the victim had with defendant during her last salon appointment in July 2001. The victim tipped her cell phone so Wilczynski could hear defendant, who told the victim: "Drop the divorce proceedings. I will f . . . ing kill you, Michele. Do you hear me? I will f . . . ing kill you. I can make you disappear. F . . . you, you bitch. Drop the divorce proceedings."

Although the dissent concludes that this threat was too attenuated in time to support a reasonable inference that defend-

4. Contrary to defendant's argument, County Court properly weighed the probative value of the evidence of defendant's prior abusive and threatening behavior toward the victim and other women against the potential for prejudice, excluding much of the evidence and permitting only limited proof directly related to motive, intent and relevant background information on the couple's relationship (*see People v Colbert*, 60 AD3d 1209, 1212 [2009]; *People v Doyle*, 48 AD3d 961, 963-964 [2008], *lv denied* 10 NY3d 862 [2008]).

ant had the intent to kill in September 2001, defendant made this statement just two months prior to the murder and disappearance of the victim. Furthermore, the statement belies defendant's assertions that he had come to terms with the dissolution of his marriage—a conclusion that we could reach only by improperly viewing the evidence in the light most favorable to defendant, as opposed to the People.[5]

In addition, the People presented testimony from the wife of one of defendant's brothers, MaryJo Harris, regarding an incident in 1996 that shed light on the victim's actions in removing defendant's guns from the family home. MaryJo Harris stated that the victim had called her from a closet in her home, upset, frightened and whispering that she had a disagreement with defendant, who began opening and closing the chamber of a shotgun. MaryJo Harris indicated that on the weekend after the murder, she confronted defendant about this incident and other threats reportedly repeated by the victim, to which defendant first responded by calling the victim a habitual liar, but ultimately admitted that he may have threatened the victim. Based upon this evidence, the jury could properly find that defendant possessed an "intent to focus his aggression on one person, namely, his wife—his victim" (*People v Bierenbaum*, 301 AD2d at 150; *see People v Thibeault*, 73 AD3d at 1239).

With respect to proof of opportunity, the victim's boyfriend testified that she visited his residence on September 11, 2001, after finishing her work shift and having a drink with two coworkers at the bar of the restaurant where they worked. She left her boyfriend's apartment around 11:00 P.M. to go to the family home, which was about 20 minutes away. Defendant later told police investigators that although the victim generally stayed out late after work, she always came home, and that September 12, 2001 was the first morning that she had not returned to care for the children. At approximately 7:00 A.M. on

**5.** The statement overheard by Wilczynski is consistent with those that the victim relayed to Francine Harris and MaryJo Harris, the wives of defendant's brothers, after the victim removed the guns from the Harris home. Both of these witnesses testified that the victim reported that defendant told her that he did not need a gun to kill her and her body would never be found. As addressed below, these statements repeated by Francine Harris and MaryJo Harris are hearsay. Unlike the statements that Wilczynski overheard directly, the threats to which Francine Harris and MaryJo Harris testified were initially admitted not for their truth, but only as evidence of defendant's reaction to being confronted with them. We note, however, that both of these witnesses testified that defendant's reaction included his ultimate admission that he may have made the statements.

September 12, defendant called Barbara Thayer, the babysitter for the children, told her that the victim had not returned home and asked if Thayer could provide last minute childcare. Thayer agreed and, when she arrived at the couple's home, found the victim's car at the end of their quarter-mile-long driveway with the keys still in the ignition and the victim's cell phone inside the car.

Thus, the People demonstrated that the victim returned home and that approximately seven hours then passed until defendant called Thayer the next morning. In addition, the People introduced evidence that defendant and the victim lived in an isolated, remote location surrounded by woods with logging trails and paths with which defendant was familiar, having regularly traveled through the woods and surrounding property on all-terrain vehicles and snowmobiles. Viewing the evidence in the light most favorable to the People, defendant and the victim were the only people—apart from their sleeping children aged 2 through 7—at their isolated residence on the night the victim disappeared, thereby establishing defendant's opportunity to murder the victim and dispose of her body on that particular night (*see People v Kimes*, 37 AD3d 1, 14 [2006], *supra*).

In order to demonstrate defendant's consciousness of guilt, the People provided proof of defendant's actions on the morning of September 12, 2001, and in the weeks subsequent to the victim's disappearance. Thayer testified that when she arrived at the couple's residence and told defendant that the victim's vehicle was at the end of their driveway, he refused to help look for the victim despite Thayer's stated concern that she might be hurt. Instead, defendant drove Thayer to the end of the driveway, telling her that the victim went to New York City. When Thayer expressed her disbelief that the victim would go to New York City without her vehicle, defendant suggested that the victim had "hitched a ride"—i.e., that she had dropped off her vehicle at the family home and hitch-hiked to New York City on the night of September 11, 2001, despite the massive terrorist attack on the City earlier that day and without informing anyone or arranging for the care of her children. Without first asking if the keys were in the ignition of the victim's vehicle, he then had Thayer drive it back to the house. He proceeded to direct Thayer regarding what she should do for the rest of the day, without mentioning the victim's name or the possibility that she might return home. Similarly, defendant did not men-

tion the victim to the family's second babysitter—who began watching the children on the afternoon of September 12—despite the presence of State Police, dogs and helicopters at his house.

On the weekend after the victim disappeared, defendant's sisters-in-law confronted him with his alleged prior threats to the victim. Both witnesses testified that defendant became upset when confronted with the victim's statement that he had said he would kill her and that her body would not be found. He ultimately admitted, however, that he may have made the statement but did not mean it. Francine Harris testified that defendant then became pale, went into the bathroom and looked as if he had been physically ill when he returned a few minutes later. Francine Harris further testified that she answered a telephone call from defendant's father that weekend during which he informed her that the victim's body had been found in a shallow grave at his cottage. When Francine Harris relayed this information to defendant, he immediately responded that the victim's body had not been found and called his father "a buffoon."

Thayer testified that one week after the victim disappeared, defendant told her that he wanted all of the victim's belongings out of their house. He told Thayer that she could sell all of the victim's possessions at a garage sale and that he would split the money with her. Approximately two weeks later, on the victim's birthday, defendant convinced his reluctant girlfriend to spend the night at his house, telling her that the victim would not be coming home that night. Finally, we note that two witnesses testified regarding a conversation with defendant on September 14, 2001, during which he told them that police had found a spot of blood the size of a loaf of bread in his garage, despite the fact that police had not yet told him any details regarding the amount of blood or the size of the blood stain found in the garage.

While proof of consciousness of guilt is generally considered a weak form of evidence, "its probative weight is highly dependent upon the facts of each particular case" (*People v Cintron*, 95 NY2d 329, 333 [2000], *supra*). Unlike the dissent, we cannot conclude that the probative value of such evidence in this case is limited, particularly when viewed in the context of the additional evidence. Defendant's actions—including his implausible explanation to Thayer regarding the presence of the victim's vehicle at the end of the driveway on September 12, 2001, his response to the statements of his sisters-in-law regard-

ing his prior threats and the alleged discovery of the victim's body, his seeking to sell all of the victim's belongings so soon after her disappearance, and his assurance to his girlfriend that the victim would not be returning—indicate consciousness of guilt or, at the very least, are inconsistent with his claimed lack of knowledge of the victim's whereabouts (*see People v Bierenbaum*, 301 AD2d 119, 135-139 [2002], *supra*; *People v Seifert*, 152 AD2d 433, 443-444 [1989], *supra*).

Perhaps most troubling, though, is the physical proof regarding the victim's blood, which consisted of evidence that hundreds of recent stains had been caused by the spattering of her blood. The stains were found on two doors, door casings and a throw rug in the kitchen adjacent to the garage, and on the garage floor of the home. A senior police investigator, Steven Anderson, described how blood changes color from red to brown as it dries and stated that the victim's blood, which he observed in the home on September 14 and 15, 2001, was red. He indicated that the blood was diluted and portions of it had been wiped away while still moist.

An expert witness for the People, Henry Lee, testified that the victim's blood, which he examined in photographs, would not appear that same red color after a month. Lee confirmed Anderson's opinion that the blood found was consistent with a clean-up attempt, and also explained that the shape of the stains demonstrated that the victim would have been at or below a height of 29 inches when her blood was spattered. Anderson, Lee and defendant's expert further testified that there was a transfer stain on the throw rug consistent with a bloody object containing the victim's DNA being placed on the rug. Thayer indicated that she laundered the blood-spattered rug twice a month, giving rise to a reasonable inference that the stains were a few weeks old at most. Although defendant suggested that the blood resulted from the victim's April 2001 car accident, that explanation is inconsistent with the age of the blood found and, in any event, refuted by the testimony of a sheriff's deputy that the victim suffered no injuries in the accident.

In sum, the People presented evidence of defendant's motive, expressed intent to kill the victim and make her disappear, opportunity to do so on the night that the victim vanished, and evidence of his consciousness of guilt. This proof, in addition to the hundreds of still-red stains caused by the spattering of the victim's blood, provided sufficient circumstantial evidence for the jury to infer that, after the victim's return home, defendant

incapacitated her in the kitchen and repeatedly struck her while she was at a height below 29 inches with an object that was placed on the throw rug, and that he then took her to the garage where she bled an additional amount that was largely wiped away while the blood was still moist. Particularly given the lack of any plausible explanation for the victim's recently spattered blood in the family home, a "valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the [jury] on the basis of the evidence at trial" (*People v Williams*, 84 NY2d 925, 926 [1994], *supra*).

Although the dissent notes that no additional signs of struggle in the home or injuries on defendant's body were found, the victim was small-framed—approximately 5 feet 2 inches tall and weighing about 90 pounds at the time of her death—giving rise to a reasonable inference that defendant could have overpowered her without a struggle when she first entered the home (*see People v Kimes*, 37 AD3d at 14). The lack of blood on the family mop or in any of the sinks does not indicate, as the dissent posits, that there was no clean-up attempt of the recently-deposited blood, particularly when the expert testimony regarding the diluted appearance of the blood is viewed in the light most favorable to the People. Similarly, while no blood was found in defendant's truck or his all-terrain vehicles, an employee testified that defendant directed him to wash his truck inside and out when he first went to work on September 12, 2001.

The dissent, pointing to the victim's drug abuse and romantic involvement with two men during the months prior to her disappearance, also concludes that other people had motives to cause the victim to disappear. While, as noted above, Tubbs came forward after defendant's first trial to indicate that he had seen another man arguing with the victim at the end of the driveway during the early morning hours of September 12, 2001, the jury was free to disregard this testimony as lacking credibility. Tubbs did not come forward for six years after the victim's disappearance despite extensive publicity, and defendant acknowledges that the jury may have rejected Tubbs's testimony due to his "flashes of anger and impatience," "intemperance," and "emotional outbursts" while testifying. Tubbs's testimony was also contradicted by that of a neighbor, who stated that she heard only a car door closing at the end of the driveway—which the People argued was defendant closing the door to the victim's vehicle after he moved it to that location from the garage. The neighbor testified that she heard no arguing, raised voices or

other commotion from the end of the driveway. In any event, there was no evidence presented that either of the individuals with whom the victim was romantically involved prior to her death had any animosity toward her or motive for killing her, that either individual had access to the areas of her house and garage where her blood was found spattered, that she was bleeding when Tubbs allegedly saw her, or that either individual had previously threatened to kill her and make her disappear, as defendant had.

Furthermore, after viewing the evidence in a neutral light, we cannot conclude that the verdict was against the weight of the evidence. In that regard, we must remain mindful that the jury is the final arbiter of credibility (*see People v Davis*, 72 AD3d 1274, 1276 [2010]; *People v Johnson*, 70 AD3d 1188, 1190 [2010]). The appellate courts give great deference to the jury's assessment of witness credibility because "juries have a superior ability to 'separate the true from the false with a degree of accuracy which, according to the theory of our law founded on the experience of many generations, cannot be attained by reviewing judges' " (*People v Romero*, 7 NY3d 633, 644 [2006], quoting *People v Gaimari*, 176 NY 84, 94 [1903]). The jury here rejected the testimony of defendant and Tubbs, and appropriate deference must be given to those credibility determinations, rather than setting them aside, as the dissent does. In light of that standard of review, we hold that the jury gave "the evidence the weight it should be accorded" (*People v Romero*, 7 NY3d at 643 [internal quotation marks and citation omitted]), and that it was justified in finding defendant guilty beyond a reasonable doubt.

Nor do we find that any of the procedural errors raised by defendant warrants a new trial. We reject defendant's argument that County Court erred in admitting the victim's hearsay statements describing his prior threats. Those statements were properly admitted to allow the jury to evaluate defendant's reaction to his confrontation with Francine Harris and MaryJo Harris over the threats (*see People v Ewell*, 12 AD3d 616, 617 [2004], *lv denied* 4 NY3d 763 [2005]; *see also People v Reynoso*, 2 NY3d 820, 821 [2004]; *cf. People v McEaddy*, 41 AD3d 877, 879 [2007]). Specifically, the victim's statements were recounted by Francine Harris and MaryJo Harris to clarify the substance of the threats that defendant acknowledged making when they confronted him. Moreover, while the court did not explicitly instruct the jury that the statements were not admitted for

their truth, the court explained that the victim's statements would normally be considered inadmissible hearsay, but the witnesses "were permitted to refer to those alleged statements for the sole purpose of explaining that they confronted [defendant] with those statements at the Cooperstown dinner. And they were then permitted to describe [defendant's] reaction to those statements." The instruction was sufficient to direct the jury that the statements should be considered only for their non-hearsay purpose, i.e., as context for the confrontation between defendant and his sisters-in-law (*see People v Gregory*, 78 AD3d 1246, 1246-1247 [2010], *lv denied* 16 NY3d 831 [2011]; *cf. People v Kass*, 59 AD3d 77, 85 [2008]). To the extent that the dissent takes issue with the People referring to those statements in their summation, we note that Francine Harris and MaryJo Harris testified that defendant *admitted* making the statements. The People were permitted and entitled to refer to that admission for its truthfulness, as well as the materially indistinguishable threat overhead by Wilczynski, which was admitted for its truth.

■ We are also unpersuaded that defendant was denied a fair trial due to County Court's preclusion of the statements and affidavit of John Steele, who died prior to defendant's retrial. After Tubbs came forward, Steele sent letters to County Court and defense counsel indicating that he had witnessed "a scene very s[ ]imilar to the account given by Mr. Tubbs," and signed an affidavit to that effect. Steele stated that he was reluctant to come forward because, if the circumstances leading to his presence near the Harris residence were revealed, it would cause embarrassment to himself, his companion at the time and his family. As defendant conceded before County Court, Steele's affidavit and statements were not admissible pursuant to any recognized hearsay exception.

Moreover, while hearsay evidence that bears "persuasive assurances of trustworthiness and [is] critical to [the] defense" may be admitted as an exception to the prohibition against hearsay (*People v Oxley*, 64 AD3d 1078, 1084 [2009], *lv denied* 13 NY3d 941 [2010] [internal quotation marks and citation omitted]; *see People v Robinson*, 89 NY2d 648, 654-657 [1997]), Steele was never subject to cross-examination, and his letter and affidavit contained several material inconsistencies. For example, Steele stated in the letter that he saw a man and a woman arguing by the side of the road, but could not hear what they were saying; in his affidavit, Steele claimed that he heard

the man telling the woman "get in the car, just get in the damn car." Under the circumstances, Steele's statement and affidavit do not possess the necessary "indicia of reliability to ensure a level of trustworthiness for admissibility" (*People v Robinson*, 89 NY2d at 657 [internal quotation marks and citation omitted]). In addition, while "[r]esolution of the issue before us hinges upon reliability rather than credibility" (*id.*), it is nevertheless worth mentioning that Steele's son submitted an affidavit averring that Steele had a propensity for untruthfulness, had never mentioned witnessing anything relevant to the case, and had professed his strong opinion that although defendant had probably killed the victim, he should not be convicted because she "was cheating on [him] and . . . deserved whatever happened to her."

■ Finally, County Court did not commit reversible error when it denied defendant's challenge for cause of prospective juror No. 11, who acknowledged that she had expressed a preexisting opinion regarding defendant's guilt or innocence.[6] On her juror questionnaire, this juror indicated that she had heard about the case from media coverage and had previously expressed an opinion or impression as to defendant's guilt or innocence. Nevertheless, she responded in the negative to two separate questions on the questionnaire as to whether her ability to be fair and impartial would be affected, including one question which asked if she "[knew] of *any* reason . . . that would prevent [her] from listening to the evidence in this case, serving as a fair and impartial juror and/or reaching a fair and impartial verdict." During questioning by defense counsel, the juror candidly indicated that she "ha[d] an opinion slightly more in one direction than the other" based upon media coverage of the case, although she gave no indication that she was predisposed against defendant. Defense counsel then asked an extensive and highly ambiguous question, in response to which the juror first expressed confusion. Contrary to defendant's contention, the juror's further response to this question did not "reveal knowledge or opinions reflecting a state of mind likely to preclude impartial service" (*People v Johnson*, 94 NY2d 600, 614 [2000]; *see People v Stroman*, 6 AD3d 818, 818-819 [2004], *lv denied* 3 NY3d 648 [2004]).

In ruling on defendant's for-cause challenge to this juror, County Court noted that the juror had stated in her question-

---

6. Defendant used a peremptory challenge to remove prospective juror No. 11 and subsequently exhausted all of his peremptory challenges.

naire that prior media coverage would not affect her ability to be fair and impartial. Having further found that nothing during the subsequent questioning raised any serious doubt regarding the juror's ability to render an impartial verdict, County Court properly denied defendant's challenge (*see People v Chambers*, 97 NY2d 417, 419 [2002]; *People v Johnson*, 94 NY2d at 614; *cf. People v McLean*, 24 AD3d 1110, 1111 [2005]).

Defendant's remaining arguments have been considered and found to be lacking in merit.

MALONE JR., J. (dissenting). Initially, I agree with the majority that "the test for appellate review [of the legal sufficiency of a jury verdict] is the same for both direct and circumstantial evidence" (*People v Rossey*, 89 NY2d 970, 971-972 [1997]). Indeed, in determining whether a verdict is supported by legally sufficient evidence, this Court must "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (*People v Danielson*, 9 NY3d 342, 349 [2007]; *see People v Bleakley*, 69 NY2d 490, 495 [1987]). In viewing the evidence in the light most favorable to the People, this Court is required to resolve any conflicting evidence in the People's favor, as the jury presumably did. However, it is not required to ignore other uncontroverted evidence that may not favor or tend to prove the People's theory of the case, nor should it. The jury heard all of the evidence in the record, resolved any conflicts and then drew inferences based upon the entire body of evidence. There would be no reason for the jury to reject uncontested facts—indeed, to do so would render the verdict against the weight of the evidence—nor do I find any reason for this Court to ignore those facts when conducting a review of the sufficiency of the evidence. The fact remains that "close judicial supervision [of jury verdicts based solely upon circumstantial evidence] is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best" (*People v Kennedy*, 47 NY2d 196, 202 [1979]). I do not believe that on this body of proof, as a whole, the jury could have concluded that the People sustained its burden of proof without making impermissible inferences drawn from equivocal evidence.

The following facts established by the evidence at trial are not disputed. At the time Michele Harris (hereinafter Harris) disappeared, she and defendant were involved in a divorce ac-

tion that she had commenced in January 2001. They were both living in the marital residence with their four young children. On the night of September 11, 2001, Harris completed her shift as a waitress around 9:00 P.M., had a drink with two coworkers, Michael Kasper and Michael Hakes, at the restaurant's bar, and then visited her boyfriend, Brian Early, at his apartment.[1] She left Early's apartment around 11:00 P.M. that night and was never seen again.

Around 7:00 A.M. the following morning, defendant called Barbara Thayer, Harris's friend and one of the family's babysitters, told her that Harris had not come home the previous night and asked her to come to the house and help him get the children ready for school. When Thayer arrived, she discovered Harris's vehicle parked at the end of the driveway, which was a quarter of a mile long and not visible from the house, got out of her own vehicle and looked for Harris. She then proceeded to the house and told defendant what she had seen. Together, they retrieved Harris's vehicle and parked it in the garage.[2] Later that morning, Thayer told Nicole Burdick, another friend of Harris, that Harris was not at home and Burdick called Harris's divorce attorney, who, in turn, reported Harris missing to the police.

State Police first interviewed defendant around 9:30 A.M. that morning at his office in one of the car dealerships that he and his family owned. Defendant fully cooperated with the two State Police investigators, who noted nothing unusual about defendant's appearance or demeanor. Defendant then accompanied the investigators to his house and permitted them to inspect Harris's vehicle, his garage and his house. At that time, neither investigator observed anything out of the ordinary; they did not detect the odor of any solvents or cleaners, nor did they notice any blood or other evidence suggesting foul play. They then proceeded to the place at the end of the driveway where Thayer had discovered Harris's vehicle, where defendant left them and returned to work. Later that day, when asked what he thought

---

1. The investigation later revealed that, at the same time that she was involved with Early, Harris was also engaged in a sexual relationship with Kasper, an admitted cocaine abuser who had previously assaulted a woman, and that she had not told anyone about her relationship with him.

2. It was during this time that defendant speculated to Thayer that Harris had gone to New York City with a friend. Although the majority characterizes defendant's theory as "implausible," the record unequivocally demonstrates that Harris, in fact, had plans to visit a friend in the New York City area the week she disappeared.

could have happened to Harris, defendant stated that he had heard that Harris had been associating with people she had met at work who were known to abuse drugs and alcohol—including Hakes and Kasper, although defendant did not know their names at that time—and suggested that those people be questioned.

Beginning on September 13, 2001—and continuing for four years thereafter—various law enforcement agencies participated in large-scale search operations to locate Harris, all to no avail. These efforts included coordinated grid searches on foot as well as aerial searches of 200 heavily-wooded acres surrounding defendant's house; divers and sonar equipment were used to search the nearby lake and other bodies of water; drop-in cameras were used to search all of the wells in the area; specially trained search and rescue canines were used around defendant's property; and low-flying aircraft equipped with thermal detection sensors flew over it. In addition, in October 2001, a tracking device was surreptitiously placed on defendant's vehicle and his movements were monitored for six months, during which time the police unsuccessfully attempted to stimulate defendant to lead them to Harris's body. The State Police also secretly stationed state troopers equipped with night vision gear and camouflage around defendant's house.[3] The only physical evidence discovered as a result of the investigation was a small quantity of Harris's blood spatter in defendant's garage and in the kitchen alcove area, which was accessible by a door from the garage into the kitchen, and was also bordered by a pantry and a laundry room. At trial, the People posited, without direct evidence, that this blood spatter was proof that, sometime around 11:30 P.M. on the night of September 11, 2001, when Harris returned from Early's apartment, defendant intentionally attacked her in their home, attempted to clean up the blood spatter, hid her body in a place where it could never be found—presumably along with the murder weapon and any items used to clean up—and then left Harris's vehicle at the end of the driveway before 4:30 A.M., at which time at least two witnesses testified to seeing it located there. Defendant purportedly undertook these actions while the couple's four children and their large dog were all asleep in the house.

---

**3.** During this time, Harris's disappearance was covered extensively in the local media and hotly debated in the community. Eventually, the story was also covered in national media, with CBS's "48 Hours Mystery" and NBC's "Dateline" dedicating episodes to Harris's disappearance and defendant's subsequent trials.

In support of this hypothesis, the People offered circumstantial evidence of defendant's motive, intent, opportunity and consciousness of guilt. First, the People stated that defendant had murdered his wife as a means to end their divorce action—in which a court decision regarding a business appraisal was pending—and to avoid paying her a substantial sum of money in a settlement. However, evidence of motive "does not establish any element of the crime, and cannot take the place of proof of [a defendant's] actual commission of the crime" (*People v Marin*, 65 NY2d 741, 745 [1985]; *see People v Giuliano*, 65 NY2d 766, 767-772 [1985]).

Next, the People presented evidence of three instances between 1996 and 2001 in which defendant made threats to Harris. In 1996, defendant opened and closed a shotgun in a threatening manner in Harris's presence, allegedly intending to intimidate her. In December 2000, he engaged in a heated argument with Harris after she told him she wanted a divorce, following which she left the residence and went to her brother's house. In May or July 2001, Harris's hairdresser overheard a telephone conversation during which defendant threatened Harris's life and demanded that she discontinue the divorce action. However, these instances of threats do not necessarily link defendant to the crime and are too attenuated in time to support a reasonable inference that defendant had the intent to kill Harris on September 11, 2001. Uncontroverted testimony at trial established that, after these threats were made, the state of the relationship between defendant and Harris had actually improved to the point where they had worked out a schedule for caring for their children that was mutually acceptable, and they amicably resided together in the same house. Indeed, more than one prosecution witness testified that, by August and early September 2001, there was less tension in the Harris household than there had been in the previous months.

The People also presented evidence of blood spatter, which was determined by DNA analysis to be Harris's, in support of the theory that Harris had been killed in the house on the night of September 11, 2001. However, both of the People's blood spatter experts testified that there is no scientifically accepted way to determine the age of spattered blood. By viewing the color of the blood as depicted in photographs, one expert, Henry Lee, opined that the spatter in the garage and on the walls in the alcove appeared to be between "fresh" and "recent," but that the spatter on the rug in the alcove was "old" and possibly

had been there for years. Lee further qualified his testimony by stating that he had not visited the scene and viewed the spatter stains himself, but had seen them only in photographs, and, therefore, could perform only a limited reconstruction of the scene. Further testimony revealed that several of the photographs viewed by Lee were affected by illumination deficiencies as a result of photographer error and that, although standard practice apparently required a color control sample card to appear in the photographs, no such color control had been employed.

Mindful of the deficiencies of the images that he studied, Lee opined that, from what he observed, the amount of the spatter was minimal, amounting to no more than 10 drops in the garage,[4] and one drop in the alcove, although the older stains on the rug possibly contained more than 10 drops. Further, both experts' testimony was inconclusive as to the cause of the spatter, opining that while the spatter pattern was consistent with medium velocity force, such finding did not necessarily indicate that the force was a violent impact or criminal act—in other words, medium velocity spatter could result from any number of nonviolent or ordinary acts or events. Indeed, the police found no signs of a struggle in the house or injuries on defendant's body to suggest a violent encounter. As for a one-inch transfer stain of Harris's blood that was found on the rug in the alcove, the People hypothesized that the stain indicated that some unknown object was used to strike Harris. Yet, no item matching that stain was ever found and, as Lee testified, the staining on the carpet was much older than the other stains, possibly by years, which is not conclusive evidence that the stain was created on the night Harris disappeared.

Although the appearance of some spatter indicated alteration by wiping, smearing or dilution, there was no evidence discovered to conclusively establish that an intentional clean-up had occurred. Importantly, there was no evidence that any solvents or cleaners had been used, no blood was discovered on the family's mop or mop bucket, which, when collected by the

---

4. Although the People claim in their brief that defendant told others about the blood in the garage before the State Police investigators had disclosed their discovery of it to him—implying that defendant had known that blood was in the garage before the police did—the record establishes that, on the afternoon of September 14, 2001, State Police Investigators Michael Myers and Michael Young informed defendant that blood stains had been found in the garage and that defendant reported such information to others later that day.

investigators was dusty and did not appear to have been recently used, and there was no trace of blood discovered in any of the sinks or sink traps in the house. Likewise, no blood, bodily fluids or other trace evidence was discovered in defendant's vehicle, in Harris's vehicle or on any of the family's all-terrain vehicles, which, if present, could have given rise to an inference that defendant had transported her body. Moreover, no evidence was discovered on defendant's heavily-wooded property to indicate that the area had been recently traversed by either foot or vehicle. Indeed, the People offered no theory as to how defendant had moved Harris's body to an undiscoverable location without leaving any evidence, or even where that location could be, which left the jury only to speculate.

Finally, as for defendant's consciousness of guilt, the People offered evidence of defendant's behavior following Harris's disappearance and asserted that it was not consistent with that of a man whose wife had gone missing. This behavior, in the days following Harris's disappearance, included not immediately contacting the police on the morning of September 12, 2001 when he discovered that Harris had not returned home, not contacting any of Harris's family or friends to inform them that she was missing and not participating in the search for her. The People also offered evidence that, in the weeks following Harris's disappearance, defendant was observed at a function at his children's school and appeared to be in high spirits, he requested Thayer to put certain of his wife's possessions in storage in the basement, and he invited Constance Gauthier, with whom he occasionally had a relationship, to his house one weekend when the children were away, telling her that she could spend the night because Harris would not be returning that night.

In evaluating the foregoing evidence, it is worth noting that evidence of consciousness of guilt is generally considered to have "limited probative value [and] its probative weight is highly dependent upon the facts of each particular case" (*People v Cintron*, 95 NY2d 329, 332-333 [2000]; *see People v Marin*, 65 NY2d at 746). In this case, it is undisputed that, at the time Harris disappeared, she and defendant had been living in separate areas of their house for almost a year and, in that time, each had been involved in extramarital relationships. The evidence indicated that both defendant and Harris had come to terms with the dissolution of their marriage and were committed to maintaining a good rapport with each other for the sake

of their young children. Moreover, given the undisputed evidence of Harris's recent lifestyle changes, which included evidence that, beginning in March 2001, she started going out to bars several nights a week, often staying out until 1:00 A.M. or later, it was not necessarily unreasonable for defendant to believe that she had become too intoxicated to return home and that she would eventually return later in the day. As for defendant's invitation to Gauthier to spend the night, both she and defendant testified that on the night in question, she arrived at defendant's house around midnight and was equivocal in her decision whether to spend the night. By 4:00 A.M., defendant wanted to go to sleep and indicated that Gauthier could do so as well because it was unlikely that Harris would return at such a late hour. Gauthier agreed and ultimately stayed with defendant until approximately 7:00 A.M. In that context, defendant's statement that Harris would not be returning that night is an insufficient basis from which to infer a consciousness of guilt. In sum, considering "the facts of [this] particular case," the evidence of defendant's purportedly unusual behavior is of "limited probative value" (*People v Cintron*, 95 NY2d at 332-333).

As further purported evidence of defendant's consciousness of guilt, and to support the theory that he had been plotting to kill Harris for some time, the People offered the testimony of Francine Harris and MaryJo Harris, the wives of defendant's brothers from whom defendant was estranged. They testified to defendant's reaction when they confronted him with information that Harris had told them that defendant threatened her by saying that he would not need a gun to kill her and would be able to hide her body so that it would never be found. Both witnesses claimed that Harris reported defendant's threat to them in March 2001, and that when they confronted defendant with the threat a few days after Harris went missing, he initially denied that he had made the threat, then eventually acknowledged that he might have said it, but claimed that he had not literally meant what he said. Importantly, as the People conceded, these statements—both those allegedly made by defendant to Harris and those by Harris to her sisters-in-law—are hearsay and, as such, they were properly admitted not for their truth, but only as evidence of defendant's reaction to being confronted with them (*see e.g. People v Reynoso*, 2 NY3d 820,

821 [2004]).[5] Viewed in that light, the probative value of this evidence is as limited as the other evidence offered to establish defendant's consciousness of guilt.

In reviewing the legal sufficiency of the evidence in this case, the Court should be mindful that "[t]he danger . . . with the use of circumstantial evidence is that of logical gaps—that is, subjective inferential links based on probabilities of low grade or insufficient degree—which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference" (*People v Cleague*, 22 NY2d 363, 367 [1968]; *accord People v Ford*, 66 NY2d 428, 441 [1985]; *People v Vitalis*, 67 AD2d 498, 503 [1979]). For that reason, where the conviction is based upon entirely circumstantial evidence, the inferences drawn therefrom must be carefully examined to ensure that "the conclusion of guilt [is] consistent with and flow[s] naturally from the proven facts" (*People v Kennedy*, 47 NY2d 196, 202 [1979]; *see e.g. People v Benzinger*, 36 NY2d 29, 32-35 [1974]; *People v Thibeault*, 73 AD3d 1237, 1238-1240 [2010], *lv denied* 15 NY3d 810 [2010], *cert denied* 562 US —, 131 S Ct 1691 [2011] [the body of the defendant's estranged wife was found at the bottom of the stairs, apparently strangled, the parties' marriage had badly deteriorated, the defendant had previously assaulted and attempted to strangle her, there were no signs of forced entry and the defendant's DNA was found on the victim's blood-stained shirt]; *People v Kimes*, 37 AD3d 1, 7-15 [2006], *lv denied* 8 NY3d 881 [2007] [cell phone records placed the defendant near the victim's apartment on the day of the murder, she could not account for eight hours of her time that day and had access to a large vehicle, in which police found duffel bags, a stun gun, sedatives, syringes, rope, masks, duct tape and items of the victim's personal property]; *People v Bierenbaum*, 301 AD2d

---

**5.** As discussed further *infra*, throughout the trial, in contravention of a pretrial ruling, the People improperly referred to Harris's statements to her sisters-in-law as if they had been admitted for their truth. The prosecutor repeatedly claimed to the jury that the reason Harris's body was never discovered was because defendant himself had told Harris that he would kill her and would hide her body in a place where it would not be found. By doing so, he encouraged the jury to draw impermissible inferences from the substance of the statements, such as in his summation when he stated, "Where did [defendant] hide her body? I don't know. It's in that place that he told [Harris] about, where her body would never be found. And all that searching in all the ponds and all the fields and woods is not going to bring [Harris's] body home to her family. [Defendant] picked a good place." In all, the prosecutor referred to the hearsay statement by defendant eight times during his summation.

119, 122-131 [2002], *lv denied* 99 NY2d 626 [2003], *cert denied* 540 US 821 [2003] [the prosecution's theory that the defendant, a medical doctor, killed his wife in their apartment, placed her dismembered body in a duffle bag and then dumped it from an airplane into the ocean was supported by evidence that the defendant was a licensed pilot and, on the day of the murder, rented a small plane, flew two hours over the ocean, lied about the flight when questioned by the police and then attempted to falsify the flight log]; *People v Seifert*, 152 AD2d 433, 436-440 [1989], *lv denied* 75 NY2d 924 [1990] [the defendant enlisted a woman to help him lure the victim to a remote location, he was seen driving a van that was later forensically linked to the crime scene and, after the killing, inexplicably fled the state]).

Here, giving the People the benefit of every permissible inference, I find that the evidence is legally insufficient to prove that defendant killed Harris, and that it is also insufficient to prove that he did so intentionally, both of which the People were required to prove beyond a reasonable doubt. In essence, the People's evidence consists of (1) three areas of blood spatter of an undetermined age and amount, (2) three threats made by defendant, and (3) defendant's actions after Harris's disappearance. Importantly, however, the blood spatter testimony was too inconclusive from which to infer, as the People proposed, that Harris was in the house on the night of September 11, 2001, much less violently and fatally attacked there. The threats, which were made months and years prior to Harris's disappearance, are insufficient to support the People's suggested inference that defendant created a plan to kill Harris and then waited months to carry it out, suggesting, with absolutely no basis, that he purposefully took advantage of the unforeseeable and unprecedented events earlier that day—September 11, 2001—in New York City and elsewhere. Finally, defendant's actions after Harris's disappearance were neither inherently suspect nor give rise to any logical inferences of defendant's consciousness of guilt.

The People's theory to support defendant's guilt becomes even less plausible on a weight of the evidence review, when all of the evidence must be considered in a neutral light (*see People v Bleakley*, 69 NY2d 490, 495 [1987], *supra*; *People v Richardson*, 55 AD3d 934, 936 [2008], *lv dismissed* 11 NY3d 857 [2008]). Notably, the People's theory of motive and intent requires an inference that, during 2001, the relationship between defendant and Harris was defined by strife and antagonism and had disin-

tegrated to the point that defendant wanted her dead. However, many witnesses testified that Harris and defendant maintained a civil relationship and that, in the months preceding Harris's disappearance, tensions appeared to have eased and Harris was optimistic about the future. Equally important is the evidence of Harris's drastic lifestyle changes, including the fact that she engaged in two extramarital relationships simultaneously, one with a man who admittedly abused drugs and had previously assaulted a woman. Harris began frequenting bars several evenings a week, she began losing a significant amount of weight—several witnesses described her as shockingly skinny—and she also apparently suffered from money trouble. More than one witness testified that Harris wanted to sell a number of valuable jewelry items, even though by court order defendant provided her with spending money and she earned her own income working as a waitress several days a week. It is undisputed that defendant had approached some of Harris's friends and family members with concerns regarding the changes to Harris's lifestyle and, to no avail, sought their assistance in addressing them with her.

Finally, evidence establishes that Harris associated with individuals who were abusing drugs such as methamphetamine, cocaine and marihuana. One of these individuals, who was one of the men having a sexual relationship with Harris, did not have an alibi for the time of her disappearance and owned a vehicle consistent with that described by a trial witness who had observed the vehicle while Harris and an unidentified man argued at the foot of the Harris driveway early in the morning of September 12, 2001. While all of this evidence suggests that other individuals could have had motives and opportunities to cause Harris to disappear, the only forensic examinations conducted were done on and around defendant's property. After reviewing all of the record evidence presented at trial, I cannot say that "the jury was justified in finding the defendant guilty beyond a reasonable doubt" (*People v Danielson*, 9 NY3d 342, 348 [2007], *supra*).

As for defendant's remaining contentions, I agree that County Court erroneously denied his request to dismiss a juror during jury selection and that the court made other erroneous rulings at trial. First, because it is incumbent upon the court to ensure that "every juror be willing to decide the case *solely* on the evidence presented and the law instructed" (*People v Arnold*, 96 NY2d 358, 362 [2001] [emphasis added]), County Court was

required to, but did not, dismiss prospective juror No. 11 for cause when she did not give unequivocal assurances that her preexisting opinions about the case would not affect her deliberations. In considering defendant's challenge for cause as to this prospective juror, the court stated that it recalled that the prospective juror had a "very slight opinion." Although defense counsel argued that the prospective juror's responses were ambiguous and she had not unequivocally stated that her opinion would play no part in her deliberations, the court denied the challenge for cause stating that, although the prospective juror did not "say those words," she had not "utter[ed] anything that would indicate even in the slightest that she could not be fair and impartial." Defendant then used a peremptory challenge to remove this prospective juror.[6]

The record does not support County Court's recollection. Instead, the record reflects that, in her sworn questionnaire, juror No. 11 admitted that she had heard about the case in the media, she had an opinion as to defendant's guilt and she had expressed this opinion to others. Upon questioning by defense counsel, the prospective juror reaffirmed that information, including the fact that she had already formed an opinion as to defendant's guilt, but said that her opinion would not be "all of it in [her] consideration," acknowledging that "[t]here's evidence." Defense counsel further questioned her as follows:

> "[COUNSEL]: And as [the court] mentioned yesterday, this is something that it's not just really assurances to the [c]ourt or the judge or the lawyers or the people in the courtroom, it's really what you do with yourself. Is the opinion you have, and you recognize you do have an opinion, is this something that will impact your ability to sit completely and judge this case only on evidence and not on the opinion that you've come to over a fairly long period of time, I imagine?
>
> "JUROR: I don't know quite how to answer that, because you've gone around. I'm saying that how I feel, opinion-wise, won't be all of what I consider if I'm in the jury.
>
> "[COUNSEL]: It's not all of what you'll consider?
>
> "JUROR: No.

---

6. Defendant ultimately exhausted all of his peremptory challenges.

"[COUNSEL]: Is it a part of what you'll consider?

"JUROR: A slight part.

"[COUNSEL]: So it's there, and you know it's there?

"JUROR: Right.

"[COUNSEL]: And you're honest enough to recognize it?

"JUROR: Yes, uh-huh."

This prospective juror openly acknowledged both on the sworn questionnaire and then in open court that she had a preexisting opinion—an actual bias—as to the issue of defendant's guilt, and that her opinion would be a part of what she considered if she was selected to serve on the jury.[7] Although the juror stated that her opinion would be only "[a] slight part" of what she considered, her preconceived opinion cannot be *any* part of what she would consider. The appearance of impartiality of this juror was not overcome by her equivocal statements; rather, an unequivocal assurance that she could and would be impartial, set aside her opinion and render a verdict solely on the evidence presented at trial was required of, but not given by, this juror (*see* CPL 270.20 [1] [b]; *People v Nicholas*, 98 NY2d 749, 751 [2002]; *People v Johnson*, 94 NY2d 600, 614 [2000]; *People v Torpey*, 63 NY2d 361, 368 [1984] ["(W)here the juror has expressed an opinion as to the defendant's guilt(,) . . . the prospective juror should be dismissed if there appears to be *any possibility* that his (or her) impressions . . . might influence his (or her) verdict" (emphasis added)]; *People v Culhane*, 33 NY2d 90, 108 [1973]). Although County Court seemingly faulted defendant for the lack of "real questioning as to [the juror's] ability to be fair and impartial," it is ultimately the court's responsibility to ensure that such questioning and answering occurs and that a sufficient assurance is obtained (*see People v Bludson*, 97 NY2d 644, 646 [2001]; *People v Johnson*, 94 NY2d at 616; *People v Torpey*, 63 NY2d at 367; *People v Russell*, 16 AD3d 776, 778 [2005], *lv denied* 5 NY3d 809 [2005]). As the Court of Appeals advises, "[i]t is almost always wise . . . to err

---

7. Although we do not know whether this juror's opinion was that defendant was guilty or not guilty (the attorneys were instructed by County Court not to inquire into specifics of the jurors' opinions, possibly so as to not "poison" the panel), I submit that the possibility that the opinion was favorable to defendant does not affect this analysis (*see e.g. People v McQuade*, 110 NY 284, 301 [1888] [A juror's existing opinion, "of the guilt or innocence of a defendant charged with (a) crime, is *prima facie* a disqualification"]).

on the side of disqualification" because "the worst the court will have done in most cases is to have replaced one impartial juror with another impartial juror" (*People v Culhane*, 33 NY2d at 108 n 3). Accordingly, I find that the juror did not provide an unequivocal assurance that she would set aside her opinion and render a verdict based solely upon the evidence and should have been dismissed for cause.

Next, I agree with defendant that County Court (Hayden, J.) improperly allowed the People to elicit at trial, in full, certain hearsay statements allegedly made by Harris to Francine Harris and MaryJo Harris. Specifically at issue is their testimony that Harris had told them that, sometime in early 2001, defendant had threatened Harris by stating that he would not need a gun to kill her and that, if he did kill her, her body would never be found. Pretrial, the District Attorney conceded that the statements at issue were inadmissible hearsay and that no exception to the hearsay rule was applicable. He assured County Court (Smith, J.) that the statements were "not being offered for the truth of their content but [were] only being offered for the [d]efendant's statement in response to them." According to both Francine Harris and MaryJo Harris, when MaryJo Harris confronted defendant about the threat, he initially denied making it, but ultimately admitted that he might have said something to that effect. The court subsequently ruled in a written order that, "since the gist of the accusing comments was that [defendant] had threatened to kill [Harris], his response was an acknowledgment that he had indeed made some kind of threat—whether real or simply in anger—along those lines" and was therefore admissible.

Even assuming, without deciding, that the pretrial ruling was proper (*see e.g. People v Davis*, 23 AD3d 833, 834-835 [2005], *lv denied* 6 NY3d 811 [2006]; *People v Ewell*, 12 AD3d 616, 617 [2004], *lv denied* 4 NY3d 763 [2005]),[8] the District Attorney's subsequent use of the statements at trial was undoubtedly not. At trial, the District Attorney attempted to question Francine

---

**8.** It is troubling that the reliability of this evidence—an issue strictly for the court to resolve—was never seriously investigated. "Relevant factors [to consider when evaluating the reliability of out-of-court statements] include spontaneity, repetition, the mental state of the declarant, absence of motive to fabricate, . . . unlikelihood of faulty recollection and the degree to which the statement was against the declarant's . . . interest" (*Nucci v Proper*, 95 NY2d 597, 603 [2001] [internal quotation marks and citation omitted]). Also relevant is the relationship the declarant has with the person to whom the statement was made (*see id.*).

Harris about whether Harris had ever "told [her] something that [defendant] said to her about [his] guns," intending to elicit testimony from Francine Harris regarding the hearsay threat that defendant allegedly made to Harris.[9] Defense counsel promptly objected, citing the prior ruling by County Court (Smith, J.), and argued that the People were permitted to elicit testimony from Francine Harris only with respect to defendant's reaction to being confronted by MaryJo Harris with the alleged threat, but not the actual words of the underlying hearsay statements. County Court (Hayden, J.) reviewed the pretrial order and determined that it was "six of one and half a dozen of another," finding that "[t]he statement which was utilized to confront [defendant] has to have had a source, an identifiable source." The court then ruled that the People were "permitted to identify the source of the statement" that was used by MaryJo Harris to confront defendant. Upon defense counsel's further argument, the court stated that it would "allow a limited exposure of the source of the statement." Over defense counsel's renewed objection, the District Attorney then proceeded to ask Francine Harris if Harris had told her something that defendant had said about his guns, to which Francine Harris replied that Harris had told her that defendant had "said if he was going to kill her, he wouldn't use a gun, they would not find her body, and they wouldn't pin it on him." Notably, this testimony was not elicited in the context of the conversation in which MaryJo Harris confronted defendant after Harris disappeared. Nor was the District Attorney's questioning limited to eliciting the source of the threat, and no instructions limiting the permissible use of the statement were given to the jury at that time. The People again elicited, word for word, the hearsay statement when MaryJo Harris testified.

The pretrial motion court (Smith, J.) focused on the admissibility of defendant's reaction to being confronted with allegations by others that he had made threats against Harris's life. Thus, the exact wording of the alleged threat was not the relevant piece of evidence. Likewise, the trial court's (Hayden, J.) ruling did not expressly permit the People to elicit the exact words of the threat. Instead, the trial court stated that it would allow "limited exposure" of the statements for the purpose of identifying the source of threat because it was relevant that the source of the information had been Harris herself.

***

**9.** The District Attorney conceded as much during the subsequent discussion between counsel and County Court (Hayden, J.) regarding defendant's objection.

Even assuming that the existence and nature of the statement was relevant to prove material issues at trial, such as identity, motive and intent,[10] it was not necessary or proper for the People to elicit the specific content and the actual words allegedly used (*see e.g. People v Bierenbaum*, 301 AD2d 119, 141-142 [2002], *supra*). Those words are not only inadmissible hearsay, as was conceded by the People, but were extremely prejudicial to defendant. A more carefully balanced evidentiary ruling that suppressed the factual content of the alleged threat could have, and should have, been formed. This is especially true in the circumstances of this case, considering that the People later used the fact that Harris's body had never been found as "proof" of defendant's guilt by arguing to the jury during summation that the absence of her body indicated that defendant had followed through on his threat.

The prejudicial effect of the improper use of the words of the threat was compounded by County Court's failure to give adequate limiting instructions to the jury. At the close of trial, defendant requested that the jury be specifically charged that the hearsay statements testified to by MaryJo Harris and Francine Harris could not be considered for the truth but, rather, only for defendant's reaction to being confronted with them.[11] Instead, the court instructed the jury as follows:

> "[N]ormally, that testimony would be considered hearsay, and as such, would not be admitted in a court of law because the alleged making of the statements by . . . Harris could not be tested for their accuracy under oath in a court of law.

---

**10.** The value and necessity of the evidence of this alleged threat as evidence of these material issues, particularly motive, is questionable. The People's theory was that defendant's motive for the killing was the divorce proceeding and his fear of having to relinquish a substantial sum of money to Harris. Inasmuch as there was ample undisputed evidence in the record of the divorce, the evidence of this alleged threat was unnecessary to establish motive (*see e.g People v Ely*, 68 NY2d 520, 530-531 [1986]; *People v Robinson*, 68 NY2d 541, 547-548 [1986]; *People v Wlasiuk*, 32 AD3d 674, 677-678 [2006], *lv dismissed* 7 NY3d 871 [2006]). Moreover, the context in which this threat was allegedly made—during an argument over Harris's refusal to return defendant's guns—was not related to the divorce action as, for instance, the threat allegedly overheard by Harris's hairdresser was.

**11.** Inexplicably, the District Attorney opposed defendant's request for a limiting instruction despite the fact that, at the time he sought a pretrial ruling on the admissibility of this evidence, he had specifically argued that such limiting instruction could be given to the jury to offset any prejudicial effect to defendant the testimony might have.

"However, in this particular instance, MaryJo [Harris] and Francine Harris were permitted to refer to those alleged statements for the sole purpose of explaining that they confronted [defendant] with those statements [after Harris disappeared]. And they were then permitted to describe [defendant's] reaction to those statements.

"And of course, [defendant] himself testified as to that conversation and his reaction to the statements.

"You, the jury, may consider that testimony regarding this episode and determine what evidentiary value, if any, you choose to assign to the exchange that occurred between MaryJo [Harris] and Francine [Harris] and [defendant]."

This instruction did little, if anything, to ensure that the jury understood that the hearsay statements could not, under any circumstances, be evaluated or considered for the truth (*compare People v Davis*, 23 AD3d 833, 835 [2005], *supra*). The inadequacy of the jury instruction cannot be considered harmless error here in light of the prejudicial effect of the statements and the importance placed upon them by the People, and in the absence of overwhelming direct evidence of defendant's guilt (*compare People v Perez*, 9 AD3d 376, 377 [2004], *lv denied* 3 NY3d 710 [2004]).

Next, I also agree with defendant that County Court (Smith, J.), on a pretrial motion, improperly prevented defendant from offering at trial the affidavit and letter by decedent John Steele as corroborating evidence of the testimony of Kevin Tubbs. In November 2007, Steele wrote a letter to the court,[12] apparently

---

12. This letter was first delivered to Judge Sgueglia, who then turned it over to Judge Smith. Judge Sgueglia had presided over this matter until December 2006, when the District Attorney requested that that judge recuse himself. Although Judge Sgueglia vehemently denied the District Attorney's allegations of bias and improper conduct, he felt that he had "no choice but to grant [the] application" for recusal, stating that simply by making such serious accusations, the District Attorney had "put the integrity of his office against the integrity of [the court]." Perhaps fueling Judge Sgueglia's frustration was the timing of the recusal motion—the parties had been informed by Judge Sgueglia that an order dismissing the indictment for, among other things, prosecutorial misconduct was forthcoming. Before the order was filed, the District Attorney filed the recusal motion, thereby thwarting Judge Sgueglia's order of dismissal. Nevertheless, the following month, Judge Smith independently reviewed—and granted—the motion to dismiss the indictment, cit-

in response to the media coverage of the CPL article 330 motion—in which the defense first presented the testimony of Tubbs[13]— and, in that letter, Steele claimed to have also driven past defendant's driveway in the early morning of September 12, 2001 and he had observed a scene similar to the one that Tubbs testified that he saw. Steele specifically stated that he was hesitant to go public with the information for two reasons: (1) that he was with an individual who was not his wife at the time that he made his observations and was concerned that he and his companion would suffer embarrassment and jeopardize his marriage if the circumstances of their outing came to light; and (2) that he was concerned about "bring[ing the] wrath" of the District Attorney upon himself and his family if he came forward publicly. After the court informed Steele that it could not act upon this information, Steele sent a copy of his letter to defense counsel. The defense investigated Steele's claims and had him prepare a sworn affidavit, in which the details of what he claimed to have seen were elaborated upon. Defense counsel sent a copy of the affidavit to the District Attorney, redacting any information that would identify Steele as the affiant, and offered the District Attorney an opportunity to submit questions for Steele and/or possibly a telephonic interview with him. For more than a year, the District Attorney attempted to uncover Steele's identity by making numerous requests to the court—along with accusations of bias and other improper

---

ing, among other things, the prosecution's intentional submission of inadmissible evidence to the grand jury.

After defendant was convicted at the first trial, Judge Smith granted defendant's CPL 330.30 motion and ordered a new trial, finding that the testimony provided by Tubbs was "entirely credible" and that if it had been heard by the jury, "there [was] no question but that the verdict would probably be different." Defendant thereafter waived his right to a jury trial and the District Attorney promptly moved to recuse Judge Smith, raising several grounds that he had previously declined to assert, including the fact that the Judge had purchased a vehicle from a dealership associated with defendant's family. Judge Smith, in turn, ultimately recused himself on the basis that he had "in essence, consciously or not, rendered [his] own 'verdict' " in deciding the CPL article 330 motion. However, in commenting on the District Attorney's recusal motion, Judge Smith stated that the District Attorney had "yet again sought to take the low road to accomplish his mission."

13.  Notably, with respect to this motion, County Court (Smith, J.) admonished the District Attorney for attaching sealed court documents to his responding affidavit to support certain allegations regarding Tubbs, calling such conduct "particularly egregious." The court further stated that the responding affidavit "violate[d] the law" and opined that "there are very few things that can be more improper than that." These sealed court documents were apparently then reproduced by the media.

conduct by the court, in violation of the Code of Judicial Conduct, as well as by defense counsel—ostensibly on the basis that such information was necessary for the police to investigate Harris's disappearance.[14] Notably, during that year, the District Attorney never accepted the defense's offer to question or interview Steele. Then, in October 2008, Steele died.

The People opposed defendant's subsequent application to admit into evidence Steele's written and oral statements, alleging that they were inadmissible hearsay that had not been tested by cross-examination, that the affidavit materially varied from the letter, and that the admission of such evidence at trial would violate the principles of *Crawford v Washington* (541 US 36 [2004]). In addition, the District Attorney attached to his opposition an affidavit from Steele's son in which the son averred that his father was not credible. At an ensuing hearing on the issue, although defense counsel conceded that the affidavit was hearsay and did not squarely fall within a specific exception, defense counsel argued that the evidence was nevertheless reliable and that the People could impeach Steele's credibility with "anything that they have at their disposal that would be independently admissible." The defense also took the position that, because the prosecution has no right under either the US Constitution or the NY Constitution to confront witnesses, the principles of *Crawford* did not preclude defendant from introducing Steele's affidavit. County Court (Hayden, J.) disagreed and denied defendant's application.

Under the circumstances here, County Court should have permitted defendant to introduce Steele's affidavit and letter at trial. First, contrary to the position taken by the People, the discrepancies between Steele's original letter to the court and his affidavit, sworn to approximately two weeks later, are not so significant as to render the affidavit inherently unreliable. Next, while both the affidavit and letter are undoubtedly hearsay, a strong argument is made that they could be considered admissible as statements against Steele's interest[15] as it is evident that Steele believed that by coming forward he was risking his

---

14. There are four letters in the record in which County Court (Smith, J.) refused to reveal Steele's identity to the District Attorney.

15. Although this exception has not been explicitly adopted—or rejected—by the courts in this state, the drafters of the Proposed Code of Evidence for State of New York saw fit to include it (*see* Proposed NY Code of Evidence § 804 [b] [3]), and many other states deem statements against societal or personal interest admissible (*see e.g.* Ark Rules Evid rule 804 [b] [3]; Cal Evid Code § 1230; Kan Stat Ann § 60-460 [j]; Me Rules Evid rule 804 [b] [3];

reputation in the community, jeopardizing his marriage and potentially subjecting himself to investigation and public discrediting by the District Attorney. Moreover, by making a sworn affidavit, Steele became subject to prosecution if the statements were false (*see* Penal Law § 210.35).

Even assuming that County Court properly determined that the writings were not admissible under a strict interpretation of the state's evidentiary rules,[16] it should be considered whether, upon Steele's death, the strict application of those rules here deprived defendant of his constitutional right to "a meaningful opportunity to present a complete defense" (*Holmes v South Carolina*, 547 US 319, 324 [2006] [internal quotation marks omitted]; *see Chambers v Mississippi*, 410 US 284, 302 [1973]; *see also People v Robinson*, 89 NY2d 648, 653 [1997]; *People v Oxley*, 64 AD3d 1078, 1083-1084 [2009], *lv denied* 13 NY3d 941 [2010]). Defendant intended to offer Steele's statements to establish that Steele and Tubbs—two witnesses who had no connection to defendant or each other—independently reported observing a woman who was completely consistent with Harris's description arguing with a man at a time and place that was inconsistent with the People's stated theory of defendant's guilt. The jury should have been allowed to consider Steele's statements, along with Tubbs's testimony, particularly considering that "substantial reasons existed to assume [the] reliability" of Steele's statements (*Green v Georgia*, 442 US 95, 97 [1979]), including the fact that he provided the information with the knowledge that doing so placed his reputation in the community and his marriage at risk, and there is no proof that he had a motive to fabricate or misrepresent his observations (*see e.g.* Prince, Richardson on Evidence § 8-403 [Farrell 11th ed]). Any issue with respect to Steele's credibility could have been raised by the People through other evidence and properly left for the jury to resolve. Indeed, when hearsay does not fit into a precise exception, its admissibility "hinges upon reliability rather than

Mont Rules Evid rule 804 [b] [3]; Nev Rev Stat Ann § 51.345; NJ Rules Evid rule 803 [c] [25]; ND Rules Evid rule 804 [b] [3]; Tex Rules Evid rule 803 [24]; Wis Stat § 908.045 [4]).

**16.** It is noted that defendant was precluded from using Steele's statements in his presentation of a defense on the basis that they did not precisely fit into an established hearsay exception, and yet the People were permitted to use the testimony of Francine Harris and MaryJo Harris to introduce prejudicial double hearsay statements as evidence against defendant, despite the fact that the double hearsay likewise did not precisely fit into any established hearsay exception.

credibility" (*People v Robinson*, 89 NY2d at 657). Deprived of this corroborating evidence of Steele's statements, the defense lacked evidence to counter the People's attack on Tubbs's credibility when it was repeatedly implied that he had fabricated his testimony for financial gain.

Finally, I agree with defendant that the District Attorney often exceeded the bounds of permissible advocacy during summation, thereby depriving him of a fair trial. The District Attorney began summation by improperly implying that, in order to find defendant not guilty, the jury had to believe that all of the witnesses at trial—except defendant and Tubbs—perjured themselves.[17] The District Attorney then stated:

> "[The defense] want[s] you to believe, that MaryJo Harris and Francine Harris conspired together, that they set up [defendant], invited him up to Cooperstown, and then made up some story about the admissions that he supposedly made while he was there at dinner.

> "Think about the magnitude and the enormity of that allegation that they're making about these two women, that they would come into this courtroom, charge that man with murder in the second degree, on some cooked-up story that he had supposedly made some admissions and statements that he had never had. Does that make any sense to you? Does it make sense to you that [defendant] is the only one that came in here and testified truthfully and that everyone—well, [Tubbs]—and that everyone else is making up this story to try to convict, you know, nice [defendant] of the murder of his wife?"

These comments had the effect of impermissibly shifting the burden of proof to defendant (*see People v Grice*, 100 AD2d 419, 422 [1984]; *see also People v Morgan*, 75 AD3d 1050, 1053-1054 [2010], *lv denied* 15 NY3d 894 [2010]).[18]

The District Attorney also improperly repeatedly implied that defendant was a liar who had carefully fabricated his testimony

---

**17.** "What the defense is asking you to believe in this case is that [defendant] came in here and testified truthfully, and that every other critical witness in this case took the stand[,] took an oath, took the stand, and gave you false testimony in some very important respects."

**18.** Later, when discussing the blood evidence, the District Attorney stated to the jury that "the only way you can find this defendant not guilty is if you accept that argument that's being made to you by the defense," which further shifted the burden of proof to defendant.

(*see e.g. People v Anderson*, 83 AD3d 854, 856-857 [2011]; *People v Skinner*, 298 AD2d 625, 626-627 [2002]; *People v Fiori*, 262 AD2d 1081 [1999]; *People v Walters*, 251 AD2d 433, 434 [1998]), telling the jury that defendant had

> "had eight years to think about what he's going to say in this courtroom. He's been through two trials. He's had all these years to go through every police report, if he wants to, all the lab reports, every note that's ever been taken concerning this case. So he's well prepared."

He also at times attacked defendant's sincerity on the stand by making statements that characterized defendant's crying during testimony as a contrived attempt to evoke sympathy from the jury (*see People v Russell*, 307 AD2d 385, 387 [2003]). He more directly branded defendant a liar when he stated, "Did you really think that he'd get up there and tell the truth, the whole truth, and nothing but the truth? Of course he's not going to do that." The District Attorney then provided "[s]ome examples of that" alleged untruthfulness and attacked specific parts of defendant's testimony, arguing to the jury that defendant had left out certain details because "that stuff doesn't fit with the story that he's trying to tell you. It doesn't fit with the product that he's—he's a salesman. He's trying to sell you a product. And if stuff doesn't fit with what he's trying to sell you, he leaves it out." The District Attorney improperly continued the theme that defendant was a salesman selling a false story to the jury throughout his summation (*see People v Ashwal*, 39 NY2d 105, 109 [1976]). At one point he said:

> "Now, did you really expect that when [defendant] made that walk up to the witness stand in this case that he was going to get up there and say, 'The People are right, the police are right, I murdered my wife'? Of course not. That's not what he's going to do. What he's going to do is get up there and try to sell you a story that's going to allow him to walk right out those doors and get away with this murder. And that's exactly what he did. He's got a product that he's trying to sell to you. And everything he says is designed to sell that product to you."

In all, the District Attorney argued more than 10 times that defendant was "selling" a story or "product" to the jury.

Further, the District Attorney frequently mischaracterized or improperly elaborated certain aspects of the evidence, including the amount of money that defendant would have purportedly

owed to Harris as a result of the divorce and the evidentiary value of the alleged threats that defendant made to Harris. Notably, without any evidentiary support for such statement, the District Attorney informed the jury that defendant would have been required to give half of his accumulated wealth to Harris as a result of the divorce and, thus, had ample motive to murder Harris. He also improperly encouraged the jury to consider the threats that defendant allegedly made as actual evidence of defendant's guilt, which was particularly egregious considering that the District Attorney had conceded that the alleged threats were hearsay statements and were not admissible for their truth, and a pretrial court ruling to that effect was in place (*see* *People v Calabria*, 94 NY2d 519, 522 [2000]).

While it is true that a prosecutor is afforded latitude to make fair comments on the evidence, and not every improper remark will result in a reversal, "summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his [or her] command" (*People v Ashwal*, 39 NY2d at 109). Eventually, "the cumulative effect of a prosecutor's improper comments during summation may overwhelm a defendant's right to a fair trial" (*People v Riback*, 13 NY3d 416, 423 [2009]). Although appropriate curative instructions to the jury may remedy any harm done during summation by prejudicial comments (*see* *People v Calabria*, 94 NY2d at 523), here, County Court's final charge to the jury did not do so. While perhaps any one improper remark, when considered in isolation, would not in itself be sufficient to require a new trial, here, it simply cannot be said that the pervasive nature of the District Attorney's improper comments did not substantially affect defendant's right to a fair trial (*see* *People v Diotte*, 63 AD3d 1281, 1283 [2009]).

Although it is a fundamental tenet of our jurisprudence that all defendants are presumed innocent until proven guilty, after reviewing the entirety of the record in this case, it seems that, from September 12, 2001 forward, defendant was presumed guilty by the police, the District Attorney, and Harris's family and friends and that, at trial, the burden of proof was shifted to defendant to prove his innocence. The many vitriolic comments made by members of the community in response to the numerous media reports on this case, which are contained in the record, leads to a rational conclusion that at least some community members on the jury could have also harbored such presumption of guilt—either consciously or unconsciously. Although I believe the proper remedy here would be a reversal and dis-

missal of the indictment due to the legal insufficiency of the evidence, considering both the many pretrial and trial errors that deprived defendant of his right to a fair trial, at the very least, defendant should receive a new trial.

SPAIN and STEIN, JJ., concur with MERCURE, J.; MALONE JR., J., dissents in a separate opinion; CARDONA, P.J., not taking part.

Ordered that the judgment is affirmed.